### PHILADELPHIA RECORD CO. v. MANU-FACTURING PHOTO – ENGRAVERS ASS'N OF PHILADELPHIA et al.

#### No. 9082.

Circuit Court of Appeals, Third Circuit.

Argued March 18, 1946.

Decided May 17, 1946.

Daniel Lowenthal, of Philadelphia, Pa. (Jerome J. Rothschild, Leonard J. Schwartz, and Fox, Rothschild, O'Brien & Frankel, all of Philadelphia, Pa., on the brief), for appellant.

Robert T. McCracken, of Philadelphia, Pa. (C. Russell Phillips, of Philadelphia, Pa., on the brief), for appellees Philadelphia Photo-Engravers' Union No. 7, I. P. E. U. of N. A., Warner D. Curry, and Charles J. Kraft.

Walter B. Gibbons, of Philadelphia, Pa. (Albert W. Sanson, of Philadelphia, Pa., on the brief), for appellees Artcraft Photo-Engravers Co., Inc., et al.

Before BIGGS, GOODRICH, and McLAUGHLIN, Circuit Judges.

Opinion of the Court.

McLAUGHLIN, Circuit Judge.

Plaintiff, a Pennsylvania corporation, is engaged in publishing a morning newspaper in Philadelphia. It brought suit in the District Court under the Declaratory Judgments Act [1] asking that the alleged activities of the defendants be declared to be in violation of the Sherman Anti-trust Law [2] and for a preliminary and final injunction. Defendants are the Manufacturing Photo-Engravers Association of Philadelphia, a corporation, the eighteen companies which are members thereof, Philadelphia Photo-Engravers' Union No. 7, I. P. E. U. of N. A. and the president and general manager of the latter.

From the facts found by the Trial Court it appears that since 1929 plaintiff has been engaged in the commercial photo-engraving business. At the time of the hearing before the District Court plaintiff's gross from this source amounted to about $100,000 a year with approximately 25% of the business in interstate commerce. Plaintiff employs twenty-seven photo-engravers, all members of the defendant union. Twenty-two of these work at night and the remaining four

---

[1] Section 274d of the Judicial Code, 28 U.S.C.A. § 400.

[2] Act of July 2, 1890, c. 647, § 1, 26 Stat. 209, as amended, August 17, 1937, c. 690, Title VIII, 50 Stat. 693, 15 U.S.C.A. § 1.

in the daytime. It is necessary to have twenty-two men on the night shift to properly take care of the newspaper's emergency requirements. During slack periods the men do commercial photo-engraving which is chiefly produced at night. Because of the local labor situation in the particular trade there are no extra photo-engravers available for plaintiff during the day. The defendant association is comprised entirely of competitors of the plaintiff in commercial photo-engraving. *These were designated by the president of the union testifying in the plaintiff's case as "* * * * the manufacturing commercial employers of Philadelphia * * *."* (Emphasis ours).

The plaintiff and the union have a contract covering plaintiff's daytime commercial photo-engraving. They have no contract as to the night commercial work. The association and the union for many years had a contract covering their general relationship which included a supplemental agreement providing that "future night forces shall be prohibited unless by consent of both parties to this agreement." The latest supplemental agreement expired February 28, 1945. The parties, however, continued to act in accordance with it and the failure to renew it did not alter their relationship in connection therewith. One of the members of the association, Peerless Engraving Co., is a partnership with one of that firm also the current president of the association. That company is permitted to do night commercial photo-engraving with the approval of the union and the association. The same company does the photo-engraving for another Philadelphia newspaper.

In 1944 plaintiff asked the association and the union to negotiate a night commercial contract with it. On September 6, 1944 there was a meeting in the office of the plaintiff. Those present were the business manager of the union, the then president of the association, its secretary and attorney and representatives of the plaintiff. The

purpose of the meeting was to find a solution which would permit the union to negotiate the desired contract. *The association's representatives objected to the proposed negotiations on the ground that plaintiff was charging lower prices which the association's representatives declared was unfair competition and on the ground that there was insufficient work for members of the association.* On September 14, 1944 the association adopted the following resolution, a copy of which was sent to the union:

"Resolved: That the Association insist upon compliance of the Supplemental Agreement dated February 2, 1937 made and executed by the Photo-Engravers' Union No. 7 of Philadelphia and Manufacturing Photo-Engravers' Association of Philadelphia, and continued by supplemental agreement each year, which agreement is now in full force and effect."

On July 30, 1945 a strike vote was taken among plaintiff's photo-engravers under the provisions of the Smith Connally Act [3] to determine whether they should stop doing commercial work at night. The employees rejected the strike proposal. On September 24, 1945 in compliance with the order of the union, plaintiff's photo-engraving employees stopped night commercial work for the plaintiff. This was not due to any grievance or dispute between the union and the plaintiff as to labor or working conditions.

The District Court [63 F.Supp. 254, 259], held "* * * the evidence sustains a finding that the union combined with, or aided and abetted, the defendant association, at least to prevent the Record from producing the commercial photo-engraving products at night." It further held that under the facts this practically prevented plaintiff from engaging in the commercial photo-engraving business.[4] The conclusion of law of the Trial Judge on this is:

"3. A combination and agreement exists between defendant union, defendant association, and defendant competitors (1) to enforce the supplementary agreement be-

---

[3] War Labor Disputes Act, Act of June 25, 1943, c. 144, § 8. 57 Stat. 167, 50 U.S.C.A. Appendix, § 1508.

[4] The Court said:

"It [plaintiff] seeks to engage in a law-

ful business in a lawful and legitimate way. Under present circumstances, it is practically prohibited from so doing by defendants' acts."

tween defendant union and defendant association, which restricts *future night commercial photo-engraving in Philadelphia without the consent of both parties,* against the plaintiff, and (2) to compel the plaintiff to cease production of commercial photo-engraving products at night." (Emphasis ours).

The Court held:

"The evidence sustains plaintiff's contention that the effect of the work stoppage, coupled with the status of the local labor supply, reduced the volume of commercial engravings produced and lowered the volume of interstate shipments. These acts of the defendants affected interstate commerce."

The Court then found that the evidence did not show an interference with interstate commerce in violation of the Sherman Act and denied the motion for a temporary injunction saying:

"The evidence adduced as to the present application of the supplemental agreement does not show such restraint upon competition which has 'or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition * * *.' [Apex Hosiery Co. v. Leader], 310 U.S. 469, 501, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044. There is no evidence that the association, in concert with the union, is attempting to fix or raise prices. Nor is there any evidence that cessation of night production of photo-engravings by the plaintiff 'had any substantial commercial effect upon either the prices at which the goods (are) sold or the supply upon the market.' United States v. Gold, 2 Cir., 115 F.2d 236, 237. There is a total lack of evidence showing that the joint action of the union and the association prejudiced the consumers in any way."

The evidence clearly supports the finding of the Trial Judge that there was a combination between the union and the association to prevent the plaintiff from producing photo-engraving products at night. This because of local labor conditions known to all the parties shows not only the intent of the defendants to prohibit the

plaintiff from engaging in the commercial photo-engraving business but achieves that practical result. The finding that the enforcement of the supplemental agreement between the union and the association was forced by the latter is fully sustained. Mr. Kraft, the president of the union testified that the association by its resolution "called attention to the union to enforce the contract that we have with them." Again he said: "But it just meant for us that they were calling our attention that we have a commercial agreement with the manufacturing commercial employers in Philadelphia, and it had stipulated paragraphs in there that we were to live up to during an agreement that we had with them." And further: "Because of the resolution, we immediately—I am pretty sure we got in touch with the Philadelphia Record company in trying to negotiate with them to eliminate all commercial work at night." He stated that the resolution of the association was the only reason for the union getting in touch with the plaintiff. At the time there was no labor dispute between the union and the plaintiff. While commercial work was frowned on by the parent body of the union, there was actually a current commercial day contract between the plaintiff and the Philadelphia union. There was also a night commercial contract in existence between the union and Peerless with the latter company admittedly handling newspaper photo-engraving production. The transcript amply justifies the District Judge's finding that the reasons the association pressed the union to prohibit plaintiff's night photo-engraving were that plaintiff was charging lower prices and because there was insufficient work for members of the association. It is obvious from the record, as the District Court decided, that the supplemental agreement between the association and the union continued effectively between parties even though it was allowed to formally expire in January 1945 after this matter had come to a head in September 1944 and after the association had insisted that the union put an end to the plaintiff's night commercial photo-engraving. It is noteworthy that at the hearing in this case September 27, 1945 the president of the

union on at least two occasions speaks of the supplemental agreement in the present tense.

There can be no doubt from the whole case that the defendant association comprised substantially the commercial photo-engraving industry in Philadelphia. It is true that the District Judge does not use the word "monopoly." He plainly implies it, however, when he holds that the supplemental agreement "restricts future night commercial photo-engraving in Philadelphia without the consent of both parties [the association and the union], against the plaintiff." The president of the union testified that the agreement was with "the manufacturing commercial employers in Philadelphia." The sense of what both the president and the secretary of the association said at the meeting of September 6th is to the same effect. Nor is there any doubt that the members of the association are in business competition with the plaintiff. Indeed, this is frankly stated in the association's brief.

As the case stands it reveals a combination of labor and business instigated by the latter to put an end to night commercial work by the plaintiff which, under the facts, would put the plaintiff out of the entire commercial photo-engraving field. The association had two reasons for so doing. The first was plaintiff's lower prices. The second was that there was not enough work to go around or, in other words, the elimination of a competitor. There was no labor dispute between the plaintiff and the union. The acts of the defendants affected interstate commerce.

We think that the plaintiff not only has shown a case where "fair play" indicates an injunction as stated by the District Court, but where as a matter of law it is entitled to such injunction. The volume of interstate commerce involved is shown generally by the over-all figures which are not contradicted. That business is primarily from the night production which has been wholly stopped. Increased day production is impossible under the circumstances. Final computations of loss could hardly have been available at the hearing held within a week of the stoppage. Even if the infer-

ence as to the amount of interstate commerce business could not be as sharply drawn as is possible under the present simple facts, the cases definitely show that the primary governing factor in such matter as this is the intent "to restrain or control the supply entering and moving in interstate commerce, or the price of it in interstate markets." Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 45 S. Ct. 551, 556, 69 L.Ed. 963; United Leather Workers' Int. Union v. Heikert & Meisel Truck Co., 265 U.S. 457, 44 S.Ct. 623, 68 L.Ed. 1104, 33 A.L.R. 566. Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044, which involved purely a labor dispute is to the same effect. There the presently lamented Chief Justice, then Justice Stone, said at page 512 of 310 U.S., at page 1002 of 60 S.Ct.:

"We only hold now, as we have previously held both in labor and non-labor cases, that such restraints are not within the Sherman Act unless they are intended to have, or in fact have, the effects on the market on which the Court relied to establish violation in the Second Coronado case."

This litigation concerns the converse of the problem involved in the Apex decision, namely, where a labor organization is used by a combination of those engaged in an industry as the means or instrument for suppressing competition or fixing prices. As such it comes squarely under the rule of the recent opinion of the Supreme Court in Allen Bradley Co. v. Union, 325 U.S. 797, 65 S.Ct. 1533, 1536, 89 L.Ed. 1939. There a combination of union, contractors and manufacturers, forced agreements to purchase and sell electrical equipment locally. Mr. Justice Black for the Court stated the precise question to be:

"Our problem in this case is therefore a very narrow one—do labor unions violate the Sherman Act when, in order to further their own interests as wage earners, they aid and abet business men to do the precise things which that Act prohibits?"

The Court in allowing an injunction to the plaintiff held:

" * * * we think Congress never intended that unions could, consistently with the Sherman Act, aid non-labor groups to

create business monopolies and to control the marketing of goods and services."

And said further at page 811 of 325 U.S., at page 1541 of 65 S.Ct., 89 L.Ed. 1939:

"A business monopoly is no less such because a union participates, and such participation is a violation of the Act." [5]

Lumber Products Ass'n v. United States, 9 Cir., 144 F.2d 546, certiorari granted 323 U.S. 706, 65 S.Ct. 430, 89 L.Ed. 569, is the same type of case.[6] There the Court said at page 549 of 144 F.2d:

"We agree with the government that the charges of the indictment and the factual allegations made in their support are not of a restraint upon commerce merely incident to the ordinary disruption of the production of an employer, arising out of a protracted labor dispute and necessary to the achieving of a legitimate objective of organized labor. Rather there is here alleged a combination for a direct restraint upon commerce with an objective of destroying the competition of that commerce and permitting the fixing and maintenance of the local area prices at an arbitrary, artificial and non-competitive level. It is such intended restraints for such an objective at which the sanctions of the Sherman Act are directed."

■ During the hearing the president of the association asked by the Court why the association would not give a contract to the plaintiff similar to the Peerless agreement replied, "I think they would." Immediately thereafter he testified that he had not changed his position from the date of the association resolution requiring the union to stop night work on the Record. He then stated that he had not understood the Court's previous question above referred to. At the end of the testimony, counsel for the association in effect stated the association had no objection to the Record having the same kind of contract as Peerless. The District Court held, "I do not think this change of attitude of the association renders the union immune from the law of the Allen Bradley case." That holding was obviously correct. The underlying principle is concisely set out in Vaughan v. John C. Winston Co., 10 Cir., 83 F.2d 370, at page 373:

"Even if he had recanted at the trial, which he did not, still there was equity in the bill when it was brought, and relief to which appellee was then entitled could not be denied because of verbal protestations upon the trial. Equity may act to avert an impending wrong; it is not divested of power because a defendant suspends his wrongdoing when he is sued, or protests his good intentions for the future."

And see Swift & Co. v. United States, 276 U.S. 311, 326, 48 S.Ct. 311, 72 L.Ed. 587.

The order of the District Court is reversed and the cause remanded with directions to that Court to grant a preliminary injunction forthwith to the plaintiff against the defendants. Such order shall be confined to the illegal activities in which the union engaged in combination with the association and the members thereof and restrain until final hearing and further order of the Court, the defendants, severally and jointly, their officers, agents, servants, employees, attorneys, and anyone in active concert or participation with them from ordering, directing, planning, inducing, or attempting to induce, any of the photo-engraving employees of the plaintiff to refuse to work upon the plaintiff's commercial photo-engraving products at night in pursuance to and in furtherance of any conspiracy and combination to stifle or restrain interstate commerce, or to secure the defendant association and its members a practical monopoly in commercial photo-engraving products. Reversed.

---

[5] The opinion in Hunt et al. v. Crumboch et al., 325 U.S. 821, 65 S.Ct. 1545, 89 L.Ed. 1954, also by Mr. Justice Black, was filed the same day as Allen Bradley Co. v. Union. That case was solely concerned with a labor dispute which had resulted in the ruination of the employer's business. This Circuit was affirmed in its holding that the Sherman Act did not there apply.

[6] Certiorari was allowed in this case at the same time as in Allen Bradley Co. v. Union, supra, because of the contrary conclusions of the Second and Ninth Circuits.