ENTERPRISE WINDOW CLEANING Co., INC., et al., Appellants, *v.* PETE SLOWUTA, as President of the Window Cleaners Protective Union, Local No. 2, Respondent.

First Department, May 10, 1948.

*George P. Halperin* of counsel (*Leon Dicker* with him on the brief; *Fred S. Weitzner,* attorney), for appellants.

*Michael F. Pinto* of counsel (*Benjamin D. Stein* with him on the brief; *Pinto & Marcantonio,* attorneys), for respondent.

VAN VOORHIS, J. Plaintiffs appeal from an order modifying an injunction decree entered April 3, 1933, by eliminating any restraint against the peaceful picketing of premises of customers of the plaintiffs.

The final decree, before being modified, was entered by consent in an action by two window cleaning companies against the Window Cleaners Protective Union, Local No. 2. The material facts alleged in the complaint have been adjudicated conclusively in the plaintiffs' favor by the judgment entered by consent (*Canfield* v. *Harris & Co.,* 252 N. Y. 502, 505; *Culross* v. *Gibbons,* 130 N. Y. 447, 454; *Davies* v. *Mayor, etc., of City of New York,* 93 N. Y. 250). The complaint, among other matters, alleged that the plaintiffs' businesses are conducted by means of contracts to wash the windows of '' several of the large downtown bank buildings, the Exchange buildings, numerous theatres and other large concerns.'' The complaint alleges that none of plaintiffs' employees have joined the defendant union, but that the latter has by threats and duress and other unlawful means, attempted to compel plaintiffs' customers to discontinue their contractual and business relations with the plaintiffs, which was the announced object of the picketing. It is further alleged that in order to do so, the union has indulged in mass picketing, threats and intimidation of plaintiffs' customers, stating particulars.

The complaint also avers, what has likewise become *res judicata* as of the time of the decree, that the defendant is '' the willing tool of an association of employers in the window cleaning industry known as the Manhattan Window Cleaners Association; that upon information and belief, the latter association is a price fixing body whose primary object is that of controlling the trade in the industry, and that the defendant union is operated, controlled and maintained by the said Employers' Association for the purpose of corralling other employers by means of coercive measures such as picketing to join the Association; that the so-called strike against the plaintiffs and the picketing of their customers is not prompted by any motive to aid and assist members of the union, but on the contrary, is the result of a

conspiracy between said Employers' Association and the defendant union to force and compel the plaintiffs to join the Association."

It is thus established in this action that the activities of the defendant which have been enjoined involved (1) mass picketing, accompanied by threats, violence and intimidation, (2) concerted action with an association of employers in price fixing, and (3) secondary boycott.

Although a court of equity has inherent power, under appropriate conditions, to vacate or to modify a continuing permanent injunction as events may shape the need (*Milk Wagon Drivers Union* v. *Meadowmoor Dairies,* 312 U. S. 287, 296–298; *United States* v. *Swift & Co.,* 286 U. S. 106, 114), the United States Supreme Court in an opinion per CARDOZO, J., in the case last cited, has been careful to limit the exercise of that power. The opinion states at page 119: " The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting. Life is never static, and the passing of a decade has brought changes to the grocery business as it has to every other. The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned."

It has been argued in behalf of the defendant union and held by Special Term that since 1933, when this injunction decree was entered, the law has changed, and that such an injunction as this would not have been granted if applied for now. For that reason, and on the assertion that the union has not indulged in violence or intimidation since the injunction was issued, it is argued that the restraints upon peaceful picketing of plaintiffs' customers should be removed.

On the other hand, the plaintiffs aver by opposing affidavit that the circumstances which called for bringing the suit still exist, that the Manhattan Window Cleaners Association, an organization of employers, entered into a conspiracy with defendant union to harass the plaintiffs due to their refusal to become members of that association, and by way of reprisal

to the appearance of one of the officers of plaintiffs before a New York County Grand Jury which indicted the manager of the employers association, and two delegates of the union, for conspiracy to injure trade. Ever since then, it is stated in the affidavit of one of plaintiffs' officers, plaintiffs have refused to join the said employers association on the ground that it was attempting to restrict free trade by controlling prices in the window cleaning industry. He further states that he and his brother were severely assaulted and beaten by persons in the employ of the said union acting in concert with the employers association. He denies that the union has not violated the injunction, the statement being made that the said employers association and the union in 1937, and 1938, commenced another campaign of terror and vandalism against the plaintiffs, their employees and customers, and that plaintiffs' employees were assaulted and properties of at least two of their customers (whose names are mentioned) were destroyed. It is stated that a discharged employee of one of the plaintiffs, associated with the union, whose name is given, was at that time convicted and sentenced in the Court of Special Sessions for an assault inflicted upon an employee of the plaintiffs, and that fourteen or fifteen representatives of the defendant were arrested for malicious mischief, assault and disorderly conduct, most of whom were convicted and sentenced. The denials of these statements are evasive and unconvincing, and are made against the background that these or similar charges were established against defendant by formal judicial admission in 1933.

In *Steinkritz Amusement Corp.* v. *Kaplan* (257 N. Y. 294, 296) the opinion states: " In the case of *Exchange Bakery & Restaurant, Inc.*, v. *Rifkin* (245 N. Y. 260, at p. 269) it was said: ' Where unlawful picketing has been continued; where violence and intimidation have been used and where misstatements as to the employers' business have been distributed, a broad injunction prohibiting all picketing may be granted. The course of conduct of the strikers has been such as to indicate the danger of injury to property if any picketing whatever is allowed.'

" Where such an injunction has been granted, ' This court may not interfere except for manifest abuse.' (*Nann* v. *Raimist*, 255 N. Y. 307, at p. 315)."

In *Busch Jewelry Co.* v. *United Retail Employees' Union* (281 N. Y. 150) as recently as 1939, this language was again quoted, and the same doctrine followed resulting in the affirmance of a judgment restraining all picketing where violence and intimidation had been proven. There has been no change in the law in this respect since 1933.

Likewise, the United States Supreme Court has even more recently affirmed the rule that combinations between trade unions and employers or employers associations for unlawful purposes are subject to being enjoined, and that even the procedural provisions of the Norris-LaGuardia Act (U. S. Code, tit. 29, § 101 *et seq.*) are inapplicable in such situations (*Allen Bradley Co.* v. *Local Union No. 3,* 325 U. S. 797 cited with approval in *United States* v. *Mine Workers,* 330 U. S. 258, 270, and in *Brotherhood of Carpenters* v. *United States,* 330 U. S. 395, 400; *Philadelphia Record Co.* v. *Manufacturing Photo-Engravers Assn.,* 155 F. 2d 799).

There is little to refute the conclusion " that the momentum of fear generated by past violence would survive even though future picketing might be wholly peaceful," or to show " that the passage of time has deprived the picketing of its coercive influence " (*Milk Wagon Drivers Union* v. *Meadowmoor Dairies,* 312 U. S. 287, 296, *supra*). The defendant has not proven, in the language of CARDOZO, J., that " dangers once substantial, have become attenuated to a shadow." (*United States* v. *Swift & Co.,* 286 U. S. 106, 119.)

It is said that the law has changed since 1933, so as to permit a secondary boycott under circumstances such as these (*People* v. *Muller,* 286 N. Y. 281; *Goldfinger* v. *Feintuch,* 276 N. Y. 281), and that this injunction should be modified for that reason. Apart from the circumstance that this was not the only ground alleged in the complaint on the basis of which the decree was entered, it is not clear that under the law, as it exists today, defendant would be entitled to picket every building in the city of New York where the plaintiffs have contracts for window washing. It is stated in the opposing affidavit, without contradiction, that " The plaintiffs have been in the window cleaning business for many years and among their customers today are the New York Produce Exchange, the New York Curb Exchange, Irving Trust Company, Chase National Bank and many large and reputable enterprises located in the State of New York and also in the State of New Jersey." These concerns do not furnish an exclusive retail outlet for the sale of goods manufactured by plaintiffs, as in *Goldfinger* v. *Feintuch* (*supra*). The facts more nearly resemble those in *People* v. *Muller* (*supra*) which went farther. in sustaining the legality of a secondary boycott than any other case which has been cited. It was a criminal action, however, in which there had been found by the Appellate Part of the Court of Special Sessions to have been a reasonable doubt concerning whether the defendants were properly

convicted of disorderly conduct in violation of subdivision 2 of section 722 of the Penal Law. That determination was affirmed by the Court of Appeals. There was no previously established record of intimidation or violence, nor of concerted action with employers to fix prices. It is not without some significance that on a question where the application of the law depends upon the degree of unity of interest between the customer and the employer (cf. *Goldfinger* v. *Feiniuch, supra*), the Court of Appeals divided in the *Muller* case four to three, and that the distinction was so close that the same judge who wrote the prevailing opinion in the *Goldfinger* case wrote the dissenting opinion in the *Muller* case.

In *People* v. *Bellows* (281 N. Y. 67) it was held unlawful, as a secondary boycott, to picket a retail store over which an electric sign had been erected by an independent contractor employing members of a rival union. The difference in degree of unity of interest in case of the erection of an electric sign, and the installation and maintenance of a burglar alarm, both in retail stores, would appear to be less pronounced than the distinction between both of these cases and the washing of windows under contract in commercial buildings, often containing numerous tenants, of the type that has been described.

*Schivera* v. *Long Island Lighting Co.* (296 N. Y. 26) appears to have been decided without ruling upon the secondary boycott question. It is stated in the concurring opinion of FULD, J. (p. 33): " There was here no secondary boycott aimed at plaintiff. Any hardship resulting to him was, as indicated, only an incidental effect, not the primary objective of the picketing." The dissenting opinion indicates that three of the other members of the court were of opinion that due to absence of unity of interest the employees of the Long Island Lighting Co. as a group were not justified in refusing to cross the picket line thrown around plaintiff's home by reason of a strike against the building contractor. A majority of the court thus appear to have been of the view that no secondary boycott or no justifiable secondary boycott was involved.

The object of the modification of the injunction sought, insofar as it can be ascertained from this record, is to get tenants and other business patrons to refuse to cross picket lines to be thrown around buildings of plaintiffs' customers, so as to cause them to discontinue their business relations unless plaintiffs, in turn, bring pressure to bear upon their employees to compel them to join defendant union. Heavy penalties may be visited upon employers who exercise coercion to prevent their

employees from joining a union, or to force them to join a particular union. Irrespective of whether, in the absence of authorized representation by a union after an election under the labor relations acts, it would be an unfair labor practice for plaintiffs thus to discriminate in regard to the hiring and tenure of employment on the basis of union membership (cf. National Labor Relations Act, § 8, subd. [a], par. [3]; U. S. Code, tit. 29, § 158, subd. [a], par. [3]; New York State Labor Law, § 704, subds. 3, 5), the proposed conduct of the union comes within the definition of " secondary boycott " in *Duplex Printing Press Co.* v. *Deering* (254 U. S. 443, 466); " that is, a combination not merely to refrain from dealing with complainant, or to advise or by peaceful means persuade complainant's customers to refrain (' primary boycott '), but to exercise coercive pressure upon such customers, actual or prospective, in order to cause them to withhold or withdraw patronage from complainant through fear of loss or damage to themselves should they deal with it."

This law is thought still to be applicable to the facts in this case. In 1941, it was said in *Opera on Tour, Inc.,* v. *Weber* (285 N. Y. 348, 356): " A secondary boycott has always been held to be an illegal labor objective. (*Auburn Draying Co.* v. *Wardell,* 227 N. Y. 1, 11.) Harm done to another or to the public may be countenanced only if the purpose, in the eye of the law, is sufficient to justify such harm."

It is not thought that the Supreme Court of the United States in *American Federation of Labor* v. *Swing* (312 U. S. 321) and *Bakery & Pastry Drivers & Helpers Local No. 802,* v. *Wohl* (313 U. S. 548) or the Court of Appeals in *People* v. *Muller* (286 N. Y. 281, *supra*) held that under the free speech doctrine the coercive effect of picketing in secondary boycott cases must in all instances be ignored. No such determination was made in *Carpenters & Joiners Union of America* v. *Ritter's Cafe* (315 U. S. 322) decided at the same time as the *Wohl* case, and the contrary was indicated.

Certainly the Congress took no such view in the adoption of the Labor Management Relations Act of 1947 (U. S. Code, tit. 29, § 141 *et seq.*). There is serious likelihood that under the decisions on the National Labor Relations Act of 1935 (U. S. Code, tit. 29, § 151 *et seq.*), plaintiffs' business affects interstate commerce so as to render applicable the Labor Management Relations Act of 1947 (see decisions cited on this point in *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 485). While the procedure under the latter act for obtaining injunctions through the

National Labor Relations Board is exclusive, there are substantive rights arising out of that statute which must be respected by the State and Federal courts in other actions and proceedings than those of which the National Labor Relations Board has exclusive original jurisdiction. No injunction is now being applied for. The discretion of the State court is being invoked, not to grant, but to relax an injunction previously granted, on the ground that the substantive law has since been altered. Changes in procedure would not be enough. Federal statutes within their sphere are binding upon State courts (*Murnan* v. *Wabash Ry. Co.*, 246 N. Y. 244). The circumstance that secondary boycotts are now forbidden by Federal law (§ 8, subd. [b], par. [4], cl. [A]; U. S. Code, tit. 29, § 158, subd. [b], par. [4], cl. [A]) does not indicate that this injunction granted in 1933, is out of date, nor that we should use our discretion to modify it so as to permit what is prohibited by the substantive law of the land.

Section 876-a of the Civil Practice Act took effect after this decree was entered, and it, therefore, does not apply regardless of whether it would govern another application for a similar decree made at the present time. (See *Sears, Roebuck & Co.* v. *9 Ave.-31 St. Corp.*, 274 N. Y. 388, 400-401.)

The order appealed from should be reversed, with $20 costs and disbursements to the appellants and the motion to modify the 1933 injunction should be denied.

Shientag, J. (dissenting). Has a court of equity the power to vacate or to modify a final decree entered on consent in April, 1933, embodying a permanent injunction in a labor controversy? If so, was that power properly exercised in this case? These are the important questions presented on this appeal.

Plaintiffs are commercial window cleaning contractors who, in October, 1931, commenced this action for an injunction. On April 3, 1933, a final decree was granted on consent of defendant restraining the members of the union and others from doing any acts to interfere with plaintiffs' rights " under certain contracts with customers, and from attempting in any manner to induce the plaintiffs' customers to violate their contracts with the plaintiffs, or to discontinue the services of the plaintiffs and from in any manner interfering with the obligations of the said contracts and from enticing, persuading or inducing in any manner whatsoever plaintiffs' customers to discontinue the services of the plaintiffs, and from picketing and aiding in the picketing of premises, managed, owned, operated, controlled or

occupied by plaintiffs' customers, and/or the places of business of the said customers wheresoever located in any manner whatsoever, and from carrying placards in the neighborhood and/or in front of the places of business or premises occupied by plaintiffs' customers wheresoever located and in any manner whatsoever, and from congregating about the places of business and/or premises occupied by plaintiffs' customers and from halting and turning aside against their will those who would go to and from the places of business or premises occupied by plaintiffs' customers and from using any and all ways, means and methods of doing any of the aforesaid forbidden acts either directly or indirectly, or through their officers, agents, servants, attorneys, confederates, or any and all persons acting in aid of or in conjunction with them or otherwise, * * * ''

Fourteen years later, June 26, 1947, this motion was made to vacate the decree on the theory that the picketing restrained had, in the meantime, by adjudications of the Court of Appeals, been made a lawful activity for unions and their members. The motion was granted to the following extent: '' Ordered that the injunctive provisions contained in the aforesaid final decree made and entered herein on April 3, 1933, be and the same hereby are modified to the extent of deleting and removing therefrom any restraint therein contained against the peaceful picketing of premises managed, owned, operated, controlled or occupied by customers of plaintiffs, wheresoever such premises are located ''.

A court of equity has inherent power, under appropriate conditions, to vacate or to modify a continuing permanent injunction (*Milk Wagon Drivers Union* v. *Meadowmoor Dairies,* 312 U. S. 287, 296–298; *United States* v. *Swift & Co.,* 286 U. S. 106; *Western Union Telegraph Co.* v. *International Brotherhood of Electrical Workers,* 133 F. 2d 955). Although a decree does not provide that jurisdiction of the cause is retained for the purpose of modification '' power there still would be by force of principles inherent in the jurisdiction of the chancery. A continuing decree of injunction directed to events to come is subject always to adaption as events may shape the need.'' (*United States* v. *Swift & Co.,* 286 U. S. 106, 114, *supra.*) '' Familiar equity procedure assures apportunity for modifying or vacating an injunction when its continuance is no longer warranted.'' (*Milk Wagon Drivers Union* v. *Meadowmoor Dairies,* 312 U. S. 287, 298, *supra.*) Nor does the fact that the final injunctive decree was entered on consent preclude vacatur or modification by a court of equity. '' We reject the argument

\* \* \* that a decree entered upon consent is to be treated as a contract and not as a judicial act. \* \* \* The consent is to be read as directed toward events as they then were. It was not an abandonment of the right to exact revision in the future, if revision should become necessary in adaptation to events to be." (*United States* v. *Swift & Co.*, 286 U. S. 106, 115, *supra.*) The permanent injunction issued in this case under the consent decree of April 3, 1933, was executory and continuing as to the objects to be obtained and a court of equity, therefore, in its discretion, has inherent power to vacate or to modify it as circumstances may require (*Pennsylvania* v. *Wheeling and Belmont Bridge Co.*, 18 How. [U. S.] 421, 431).

The next question to consider is whether vacatur or modification of the consent decree of April, 1933, is warranted under the circumstances of this case.

When the final injunctive decree was entered in 1933, the cases in this State squarely held that the mere act of peaceful picketing of the customers of a window cleaning concern by the members of an aggrieved union constituted in and of itself an illegal secondary boycott (*Commercial House & Window Cleaning Co.* v. *Awerkin*, 226 App. Div. 734; *Superior House & Window Cleaning Co.* v. *Awerkin*, 228 App. Div. 617). Since 1933, the law in this field has been changed in important respects: first, by legislation — the enactment of section 876-a of the Civil Practice Act in 1935 with its broad definition of "labor dispute", (see for example *Schivera* v. *Long Island Lighting Co.*, 296 N. Y. 26; *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products, Inc.*, 311 U. S. 91); second, by decisions of our State courts enlarging the lawful orbit of so-called secondary strikes and secondary picketing; and, third, by a series of important decisions of the Supreme Court of the United States to the effect that picketing and the use of placards in industrial controversies are protected by the Fourteenth Amendment of the Federal Constitution against invasion by the States.

Examining the decisions of the courts of this State, we encounter the leading case of *Goldfinger* v. *Feintuch* (276 N. Y. 281, 286 [1937]), holding that: "Within the limits of peaceful picketing, however, picketing may be carried on not only against the manufacturer but against a *non-union product* sold by one in unity of interest with the manufacturer who is in the same business for profit. Where a manufacturer pays less than union wages both it and the retailers who sell its products are in a position to undersell competitors who pay the higher scale, and this may result in unfair reduction of the

wages of union members. Concededly the defendant union would be entitled to picket peacefully the plant of the manufacturer. Where the manufacturer disposes of the product through retailers in unity of interest with it, unless the union may follow the product to the place where it is sold and peacefully ask the public to refrain from purchasing it, the union would be deprived of a fair and proper means of bringing its plea to the attention of the public.''

To be sure, the customers of the plaintiffs are not in the same line of business, in which they are engaged. It is urged, however, that if a union may follow a nonunion product to the place where it is sold, as was permitted in *Goldfinger* v. *Feintuch,* it is even more important to allow a union to follow nonunion labor to the place where it is actually employed, indeed to the only place where that labor renders any services. The employees of a window cleaning concern do no work at the place of business of that concern. The only work they do is performed at the place of business of the customers of the window cleaning concern. However, the right to picket customers of a window cleaning concern, under appropriate conditions, need not rest on the decision in *Goldfinger* v. *Feintuch.* Nor is that right to picket prohibited by *People* v. *Bellows* (281 N. Y. 67) which held to be unlawful the picketing, by a union, of a customer's place of business because he did not remove or demolish an electric sign on his premises which he had ordered from an independent contractor who employed members of a rival union in connection with its erection. In that case there was no continuing servicing or labor performed in connection with the sign.

The right to picket customers of the plaintiffs, it is urged, is settled by the recent decision of the Court of Appeals in an analogous case (*People* v. *Muller,* 286 N. Y. 281). There, the court affirmed the reversal of a conviction for disorderly conduct under subdivision 2 of section 722 of the Penal Law, the defendant members of a labor union having been charged with illegal picketing. The facts disclosed that the defendants in an orderly and peaceful manner picketed the complainant's place of business where an electric burglar alarm apparatus had been installed by the defendants' employer against whom they were conducting a strike. Their purpose was to inform the public that the burglar alarm system installed in the complainant's haberdashery store was not being serviced and maintained by the union of which the defendants were members. In that respect this case is to be distinguished from the earlier

case of *People* v. *Bellows* (281 N. Y. 67, *supra*) above referred to. The complainant in *People* v. *Muller* (286 N. Y. 281, 284, *supra*) was not in the same line of business as that carried on by defendants' employer. Nevertheless, the court said: " The picketing is for the purpose of promoting the lawful interests of a labor union in a labor dispute. * * * There is here a ' labor dispute ' as that term is defined in section 876-a of the Civil Practice Act even under the restrictive interpretation of the scope of the statute by this court in *Opera on Tour, Inc.,* v. *Weber* (285 N. Y. 348). Even were that not true, however, peaceful picketing by the members of a union in front of a business served by the union is the exercise of a right of free speech guaranteed by the Constitution of the United States as construed by the Supreme Court of the United States." (*American Federation of Labor* v. *Swing,* 312 U. S. 321, decided February 10, 1941; *Bakery & Pastry Drivers' & Helpers Local No. 802* v. *Wohl,* 313 U. S. 548.)

The window cleaning servicing here involved is similar to the servicing of the burglar alarm system in *People* v. *Muller.* There the burglar alarm system was leased to the store owner and the leasing agreement provided for continued servicing by the installing company. The effect of the decision in the *Muller* case would seem to be that since the picketing was peaceful and there was a continuing obligation on the part of the installing company to keep the apparatus in serviceable condition, it was lawful for the union, through the usual method of picketing with a sign, to inform the public that the burglar alarm system was not being serviced by the union of which the defendants were members. So, too, it is urged that the defendants in this case, in which incidentally no jurisdictional dispute or any conflict between union rivals is involved, should have the right to inform the public that the continuing services rendered by appellants' employees, of cleaning the windows of its customers at regular intervals, was work performed by persons not members of the window cleaners' union. It can hardly be said that the objective of a window cleaners' union is an unlawful one when it seeks to picket the very place where nonunion window cleaners are working. To characterize such action by the defendants as an unlawful " secondary boycott " begs the question. If the decisions in this field during the past fifteen years indicate anything, it is that such a term as " secondary boycott " has a shifting meaning and is to be considered in the light of the facts and the circumstances of a particular

case. The defendants argue with much force that no secondary boycott is in any way involved in this case.

But it is urged that if you carry this right to its logical conclusion, what is there to prevent the ultimate consumer from being picketed at his home or in his person if he used the products of nonunion labor? It suffices to say that, at some point, the State has the right to draw the line. It may be difficult to define precisely where that line is. Principles of law are rarely carried to dryly logical extremes. The State has it in its power reasonably to limit or to insulate, by legislation or by judicial decision, the area of industrial conflict and to prevent an invasion of the privacy of an ultimate consumer or perhaps even of an intermediary whose relationship to the labor controversy is remote. But that area should not be so limited as to deprive workingmen of the only effective means which they have of making known their legitimate grievances.

The decision in *People* v. *Muller* (286 N. Y. 281, *supra*), as the opinion in that case indicates, was influenced, in large measure, by a series of decisions of the Supreme Court of the United States beginning with the leading case of *Thornhill* v. *Alabama* (310 U. S. 88, [1940]), and going down to and including the case of *Bakery & Pastry Drivers & Helpers Local 802* v. *Wohl* (315 U. S. 769).

The *Thornhill* case reiterated the doctrine that the freedom of speech and of the press which are secured by the First Amendment against abridgment by the United States are among the personal rights and liberties which are secured to all persons by the Fourteenth Amendment against invasion by a State. The court proceeded to lay down the fundamental principle that " In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution." (P. 102.) In *American Federation of Labor* v. *Swing* (312 U. S. 321, 323, *supra*), the court said that the issue in the case was reduced to this: " Is the constitutional guarantee of freedom of discussion infringed by the common law policy of a state forbidding resort to a peaceful persuasion through picketing merely because there is no immediate employer-employee dispute? "

The court answered this question in the affirmative, holding: " The scope of the Fourteenth Amendment is not confined by the notion of a particular state regarding the wise limits of an injunction in an industrial dispute, whether those limits

be defined by statute or by the judicial organ of the state. A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him. * * * The right of free communication cannot therefore be mutilated by denying it to workers, in a dispute with an employer, even though they are not in his employ." (P. 326.)

In *Milk Wagon Drivers Union* v. *Meadowmoor Dairies* (312 U. S. 287, 293, *supra*) Mr. Justice FRANKFURTER said: "The starting point is *Thornhill's* case. That case invoked the constitutional protection of free speech on behalf of a relatively modern means for 'publicizing, without annoyance or threat of any kind, the facts of a labor dispute.' * * * the whole series of cases defining the scope of free speech under the Fourteenth Amendment are facets of the same principle in that they all safeguard modes appropriate for assuring the right to utterance in different situations. Peaceful picketing is the workingman's means of communication."

One of the most far-reaching cases in this series is that of *Bakery & Pastry Drivers & Helpers Local 802* v. *Wohl* (315 U. S. 769, *supra*). There the union picketed manufacturing bakers who sold to peddlers and threatened to picket grocers and retail bakers who bought from peddlers. The labor controversy was the effort of the unions to compel the peddlers to hire a union driver one day a week. There was no labor relationship between the peddlers and their customers or between the grocers and the retail bakers and the union; nevertheless the Supreme Court of the United States held that the Court of Appeals erred in sustaining injunctions which restrained the union, its officers and agents from picketing either the places of business of manufacturing bakers who sold to the respondents (the peddlers) or the places of business of their customers. Mr. Justice JACKSON in his opinion said: "So far as we can ascertain from the opinions delivered by the state courts in this case, those courts were concerned only with the question whether there was involved a labor dispute within the meaning of the New York statutes, and assumed that the legality of the injunction followed from a determination that such a dispute was not involved. Of course that does not follow: one need not be in a 'labor dispute' as defined by state law to have a right under the Fourteenth Amendment to express a grievance in a labor matter by publication unattended by violence, coercion, or conduct otherwise unlawful or oppressive." (P. 774.) And he

went on to make this significant observation (P. 775): " A state is not required to tolerate in all places and all circumstances even peaceful picketing by an individual. But so far as we can tell, respondents' mobility and their insulation from the public as middlemen made it practically impossible for petitioners to make known their legitimate grievances to the public whose patronage was sustaining the peddler system except by the means here employed and contemplated; and those means are such as to have slight, if any, repercussions upon the interests of strangers to the issue."

The Supreme Court recognized, however, that the line could be drawn somewhere and, by a divided court of five to four, it did draw the line in *Carpenters & Joiners Union of America* v. *Ritter's Cafe* (315 U. S. 722). There, the court held that, without violating the strikers' right of free speech, a State could enjoin, as a violation of the State anti-trust law, the picketing of a restaurant by union carpenters and painters having no grievance against its owner other than that he had contracted for the construction of a building not connected with the restaurant business, and a mile-and-a-half away, with a contractor who employed nonunion labor. The court said " Texas has deemed it desirable to insulate from the dispute an establishment which industrially has no connection with the dispute." (P. 727.) The difference in facts between that case and the one under consideration is obvious.

It seems clear, therefore, that there has been such a change in the law since 1933, as to require a court of equity to vacate or to modify the sweeping injunction then granted. But it is urged that the injunction of 1933, was in any event justified because of violence and other unlawful methods resorted to by defendant union. In *Milk Wagon Drivers Union* v. *Meadowmoor Dairies* (312 U. S. 287, [1941]), the court held that a permanent injunction in a labor dispute was warranted where the strike was conducted " In such a setting it could justifiably be concluded that the momentum of fear generated by past violence would survive even though future picketing might be wholly peaceful." (P. 294.) However, the court went on to say that its decision was " no bar to resort to the state court for a modification of the terms of the injunction should that court find that the passage of time has deprived the picketing of its coercive influence " (P. 296) and that the injunction was " justified only by the violence that induced it and only so long as it counteracts a continuing intimidation. Familiar

equity procedure assures opportunity for modifying or vacating an injunction when its continuance is no longer warranted." (P. 298.) "Right to free speech in the future" the court said " cannot be forfeited because of disassociated acts of past violence." (P. 296.)

Instead of attempting to modify a fifteen-year-old injunction based upon a then existing state of facts, it would seem to be the better policy in this case, and in the interests of all concerned, to vacate the old injunction. Any future controversy between the parties could then be disposed of *de novo* in accordance with the facts as they would then be developed and pursuant to the present law as applied to those facts. It would be inadvisable, indeed impracticable, to attempt to outline in advance, particularly in a dissenting opinion, the limitations that may be imposed upon the picketing of plaintiffs' customers; that should be determined by the court at Special Term when and if any controversy is presented to it. The court would then consider, among other things, the limitations which, in the public interest, might reasonably be imposed on the scope and character of the picketing and to rule out any incidents of the picketing which would have the effect of coercive pressure, intimidation, restraint and threats. The picketing could be so limited as to remove any aspects of a secondary boycott and confined to the lawful dissemination of the truthful facts in the labor dispute.

This opinion cannot and does not purport to lay down the rules of law that are to be applied to any future labor controversy between the parties involved. It shows that since 1933, there has been such a marked change in the development of the law and its trend that the fifteen-year-old injunction should not longer be allowed to operate and to control the future conduct of the parties in perpetuity.

The injunction now sought to be vacated was issued by consent in 1933. At no time was there any trial of the issues, nor were there any findings of fact and conclusions of law. There is nothing in the language of the fifteen-year-old consent decree which indicates any determination by the court or any admission by the union that it was engaged in a conspiracy with an association of employers in the window-cleaning industry formed to fix prices in the industry or that the union was, as charged, being operated, controlled and maintained by the association of employers for the purpose of coercing other employers to join their association. Such charges are denied by the opposing affidavits on this motion.

That leaves one further matter to be considered: the effect of the Federal statute (Labor Management Relations Act of 1947 — particularly see § 303 thereof [U. S. Code, tit. 29, § 187]) popularly known as the Taft-Hartley Law. State courts have no power to grant injunctive relief under that statute; that jurisdiction is confined to the Federal courts (§§ 301, 302; U. S. Code, tit. 29, §§ 185, 186). The State courts do have jurisdiction of actions to recover damages for violation of certain provisions of the Taft-Hartley Law (§ 303, subd. [b]; U. S. Code, tit. 29, § 187, subd. [b]). Inasmuch as that act would apply only to employment in interstate commerce or in the production of goods for interstate commerce or to an industry or activity affecting commerce, its scope and its effect are primarily for the Federal courts. (Cf. *Bakery Sales Drivers Local Union No. 33* v. *Wagshal*, 333 U. S. 437.) It is, however, appropriate to point out that, if the future conduct of the defendants is to be determined or limited by the recently enacted Labor Management Relations Act, the provisions of that statute to the extent, if any, that they may be applicable, should not be engrafted upon a fifteen-year-old injunction granted by consent but should be considered in the light of the present-day factual background. In any event this disposition in no way involves any interpretation of the Taft-Hartley Law. Any action of the defendants must, of course, be in conformity with the applicable Federal as well as State laws and the plaintiffs would have an adequate remedy in an appropriate tribunal should there be any attempt at a violation of a Federal statute.

The order appealed from should, accordingly, be modified to the extent of granting the motion to vacate the final injunctive decree of April 3, 1933, and as so modified affirmed.

PECK, P. J., and DORE, J., concur with VAN VOORHIS, J.; SHIENTAG, J., dissents in opinion.

Order reversed, with $20 costs and disbursements to the appellants and the motion to modify the 1933 injunction denied. Settle order on notice.