**ADAMS DAIRY COMPANY, a Corporation, Appellant,**

v.

**ST. LOUIS DAIRY COMPANY, a Corporation, Pevely Dairy Company, a Corporation, and Milk Wagon Drivers and Inside Dairy Workers Local Union No. 603, American Federation of Labor, a Voluntary Labor Organization, Appellees.**

**No. 15856.**

United States Court of Appeals
Eighth Circuit.
Oct. 14, 1958.

Charles V. Garnett, Kansas City, Mo. (F. William McCalpin, St. Louis, Mo., Harvey Burrus and Rufus Burrus, Independence, Mo., were with him on the brief), for appellant.

John H. Lashly, St. Louis, Mo. (Jacob M. Lashly, Paul B. Rava and Lashly, Lashly & Miller, St. Louis, Mo., were with him on the brief), for appellee St. Louis Dairy Co.

E. C. Hartman, St. Louis, Mo. (Alexander Kerckhoff and Hartman, Guilfoil & Albrecht, St. Louis, Mo., were with him on the brief), for appellee Pevely Dairy Co.

Harry H. Craig, St. Louis, Mo. (Norman W. Armbruster, John T. Wiley, Jr., and Wiley, Craig, Armbruster, Schmidt & Wilburn, St. Louis, Mo., were with him on the brief), for appellee, Union.

Before GARDNER, Chief Judge, and VOGEL and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

In this action, based upon an alleged violation of Section 1 of the Sherman Act,[1] wherein recovery was sought for threefold the damages allegedly sustained by Adams Dairy Company, the appeal is from the judgment following jury verdict that it take nothing by this suit.[2]

---

1. 26 Stat. 209, 15 U.S.C.A. § 1; Civil remedy provided by 38 Stat. 731, 15 U.S.C.A. § 15.

2. For brevity and convenience, we shall designate the parties as follows: Adams Dairy Company as "Adams" or "Appel-

The meritorious appellate issues are focused upon: (1) the failure of the trial court to charge the jury that the written labor contract executed by all of the parties to this litigation, and twenty-seven "small" dairies operating in the St. Louis, Missouri area (not parties to or involved in this controversy) in and of itself, in light of the evidence, was an illegal contract in restraint of trade and violative of the Sherman Act;[3] and (2) the actions, comments and rulings of the trial judge, throughout the course of the trial, the cumulative effect of which, according to appellant's contention, prevented it from having a fair and impartial trial.

In summary, the events and circumstances pertinent to the first contention are as follows: Adams, with St. Louis Dairy and Pevely, is engaged in the fluid milk industry in the St. Louis, Missouri area, where, in 1947, St. Louis Dairy supplied approximately 27 per cent and Pevely approximately 36 per cent of the fluid milk that was marketed. The Union, a voluntary labor organization, was the bargaining agent for the employees of the St. Louis area dairies, including Adams, St. Louis Dairy and Pevely. A more detailed recitation of the relation between the Union and the individual dairies will be set out hereafter.

Adams was a newcomer in the St. Louis market, having started operations in November, 1947. The president of the company testified that he had studied the market conditions in St. Louis for sometime, observing among other things

lant"; St. Louis Dairy Company as "St. Louis Dairy"; Pevely Dairy Company as "Pevely"; Milk Wagon Drivers and Inside Dairy Workers Local Union No. 603, American Federation of Labor, as "Union." St. Louis Dairy Company and Pevely Dairy Company shall sometimes be referred to as "Appellee Dairies."

3. Adams chose to encompass this theory in its refused instructions 9 and 10 which are:

*Instruction 9*

"You are further charged that it is illegal and a violation of the anti-trust laws for processors and distributors of milk and dairy products to agree among themselves, or to agree with any processor and distributors or with a labor union, upon a commission rate *which has for its sole purpose,* within a designated competitive area, such as the St. Louis area, to restrict, restrain or prevent competition in interstate commerce of such milk and dairy products. Then you are instructed that such labor contract, if it so unlawfully restricts, restrains or prevents competition, is illegal and a violation of the anti-trust laws and in and of itself constitutes a conspiracy and illegal contract and business practice." (Emphasis supplied.)

*Instruction 10*

"Plaintiff further contends that the inclusion in the 1950 labor contract of the load limiting clause, limiting the route loads of its driver salesmen by the device of increasing their commissions from 2 cents per point to 4 cents per point on all deliveries in excess of 40,000 points per month, together with the fact that such limitation adversely affected the plaintiff and did not adversely affect, to any appreciable degree, either the St. Louis Dairy or the Pevely Dairy, and together, also, with the fact that such limitation so placed upon the plaintiff tended to restrict or lessen competition and restrain trade or commerce, and together, also, with the fact that such clause in such contract was inserted therein, *not because of any labor purpose or objective,* but with the design and intention of lessening the competition of plaintiff with the business of the two defendant dairies, renders such contract one which *unreasonably* restrains trade or commerce within the meaning of the Sherman Act, and establishes plaintiff's right to recover such damages as it may have sustained by reason thereof." (Emphasis supplied.)

"If you find and believe from the evidence that such limitation in said labor contract did adversely affect the plaintiff and did not adversely affect, to any appreciable degree, either the St. Louis Dairy or the Pevely Dairy, and that such limitation so placed upon plaintiff tended to restrict or lessen competition and restrain trade or commerce, and that such clause in such contract was inserted therein, *not because of any labor purpose or objective,* but with the design and intention of lessening the competition of the plaintiff with the business of the two defendant dairies, and that plaintiff was damaged thereby, your verdict should be for the plaintiff and against the defendants." (Emphasis supplied.)

that no milk was offered for sale in paper containers, and that retail sales in stores were small as compared with sales made direct to the homes of the consumers. He stated that to create large volume sales through food stores, it was essential that milk be placed in disposable paper containers and sold to such stores at a price that would enable them to resell to the consumer at a price at least 2 cents less than the consumer would pay for direct delivery to the home. With these factors in mind, Adams entered the St. Louis market, and was able to provide milk in paper cartons, selling only to retail outlets, principally supermarkets, at a price which would enable them to compete with home deliveries. Adams conducted its sales entirely on a wholesale basis, selling large volumes to relatively few food stores. When Adams entered the market, the other dairies, including St. Louis Dairy and Pevely, began marketing milk in paper containers. Appellee dairies, though selling wholesale accounts, also had a large volume of home delivery accounts. Adams made no home deliveries.

As stated, the Union served the milk industry in St. Louis as bargaining agent for the employees of the various dairies, including the parties here involved. It negotiates what is known as an "industry-wide contract," that is, one contract which is signed by all of the dairies in the area. It also appears that there was in existence an employer association of some 27 "small" dairies known as the "St. Louis Milk Distributors' Association," the purpose of which was to enable the employer group to present a solid front, in behalf of the 27 dairies it represented, to the labor union in the negotiation of labor contracts, and it was the custom of the Union to meet with representatives of Pevely, St. Louis Dairy, and the Association and negotiate labor agreements, which were then presented to the individual dairies for signatures. Adams joined the Association in 1948 and continued its membership until the contract here in controversy was presented. Appellee dair-

ies were never members of the Association.

A substantial element of cost to any dairy is the expense incurred in delivery of its product. Adams' complaint is based upon the allegation that the industry-wide labor contract of July 1, 1950, was entered into by appellee dairies and the Union for the purpose of adversely affecting Adams' costs of delivery, thereby compelling Adams to lose its competitive position price-wise in the St. Louis area. In order to understand Adams' position in the competitive market, it is necessary to review in some detail the delivery cost structure under which all dairies operated, pursuant to the provisions of the industry-wide union contract applicable when Adams first entered the St. Louis market, and under which Adams, and the appellee dairies operated until the new contract of July 1, 1950, was put into effect. The drivers who delivered milk, whether at retail to the home, or at wholesale to food stores, were paid on a commission basis, governed by the terms of the union contract. Under the contract, each driver was paid a base salary, then commissions were paid on a "point" system—each "point" representing a unit of dairy products, such as a quart of milk, a half-pint of cream, etc. Under the union contract in existence when Adams entered the market, no commissions were paid on the first 12,500 points per month; from 12,500 to 24,000 points, the driver was paid $\frac{1}{2}$ cent per point; 24,000 to 27,000, 1 cent per point; 27,000 to 30,000, 1$\frac{1}{2}$ cents per point; and on all sales over 30,000 points, 2 cents per point. Because of the nature of the market supplied by Adams (twelve routes supplying large supermarkets almost exclusively), large volumes were delivered by relatively few drivers—thus at the time of the negotiations for the 1950 contract, Adams' twelve routes averaged more than 55,000 points per month, with some routes running as high as 80,000 points per month. It was testified that Adams' drivers had annual earnings as high as $15,000 to $17,500. Another cost factor

which might be mentioned is that of overhead in the maintenance of trucks, gas, oil, etc. Again, because of the large volume deliveries, Adams was able to spread these operating costs, with a resultant low rate per unit cost for delivery.

It appears that appellee dairies were in a different position. For example, on July 1, 1950, Pevely had 300 retail routes and 89 wholesale routes, the retail routes averaging something less than 10,000 points per month, and the wholesale routes a little over 21,000 points per month. St. Louis Dairy operated 173 retail routes, averaging 11,236 points, and 43 wholesale routes, averaging 26,674 points. It further appears that during the period from January 1, 1948, to June 30, 1950, Pevely had only two wholesale routes which averaged more than 30,000 points per month and no wholesale routes averaging more than 40,000 points, the two "high point" routes averaging 31,-682 and 31,015 points for only 20 of the 30 months of that period. From the record it appears that St. Louis Dairy had only two routes averaging more than 30,000 and no routes averaging more than 40,000 points per month.

We now come to the 1950 contract of which Adams complains. Briefly, the offending clause provided that drivers were to be paid a commission of 4 cents per unit on all points per month above 40,000. In addition, any driver whose route was split was to receive full base pay, plus average commissions equal to his monthly earnings just prior to the split, for a period of four months following the splitting of routes. Adams charged that when faced with an increase of commissions from 2 cents to 4 cents on all units over 40,000, and as applied to its drivers whose routes averaged 55,000 units, it had a choice of closing down operations or splitting the routes, so that no one driver would have such volume as to carry sales into the prohibitive 4-cent rate. Adams prevailed on the union to delay the effective date of the new wholesale commission rate for a period of 60 days, during

which period Adams purchased 10 new trucks and divided the routes, so that when the contract terminated four years later, Adams was using 34 routes to handle the deliveries. It further appears that the Adams drivers, dissatisfied with the cut in their income, organized their own labor union, signed a new contract eliminating the 4-cent rate, and that routes were then reduced in number.

Adams alleged, and here contends, that the clause increasing the commission to 4 cents served no legitimate labor purpose; that Adams was the only dairy company adversely affected by the clause, inasmuch as the other dairies did not have routes reaching into 40,000 points, and that its sole purpose was to increase Adams' distribution costs, thereby forcing it from the competitive market. The appellee dairies and the Union insist that the contract was negotiated at arm's length; that the Union was solely concerned with improved conditions in the dairy industry, and sought to ease heavy loads which were damaging the health of the drivers, and, in addition, the Union urges that it was interested in providing more jobs for union men and thus intended to encourage route splitting.

We now attend to the circumstances surrounding the negotiations and execution of the 1950 industry-wide contract. The union contract, with the maximum 2-cent rate, was to expire on June 30, 1950. In May or June, 1950, a joint industry meeting was held, attended by all parties here involved and a representative of the St. Louis Milk Distributors' Association. At that time, the Union presented its proposals for wages, hours, commissions and working conditions. No actual bargaining took place at this session, but a representative of Adams expressed its opposition to the increased commission rate. It appears that Adams became further dissatisfied and withdrew from the St. Louis Milk Distributors' Association and engaged the services of a new attorney. Two or three industry-wide bargaining sessions were held subsequently, but Adams was not represented. It appears that this lack of

representation was by choice. Testimony indicated that the individual dairies, including appellee dairies, opposed the union demands in toto, and no progress was made. Thereupon, as had been the custom in past negotiations, the Union approached the dairies singly, and began separate negotiations with St. Louis Dairy, during which time the proposed 30,000 point bracket for the 4-cent rate was increased to 40,000 points as a compromise to a 50,000 point figure proposed by St. Louis Dairy. After reaching an agreement with St. Louis Dairy, the Union met separately; first with the small dealers' association, and then with Pevely, and each accepted the proposed contract. The Union then approached Adams, and after agreement on the 60-day delay on the effectiveness of the new commission rate, Adams too signed the contract. Testimony further indicated that throughout these various bargaining and negotiation sessions, no mention was made, nor discussion had, of Adams' particular position in the wholesale market in relation to the effect of the 4-cent commission rate; that St. Louis Dairy, in particular, strenuously resisted the 4-cent rate and endeavored to raise the "points" to which the rate was to be applied high enough so that none of the dairies would be affected. In addition to the evidence concerning the negotiations between the Union and the employer groups, testimony of various Adams' drivers, who were members of the Union, indicated that prior to the new contract, other Union drivers from competitor dairies expressed jealousy of the large earnings of Adams' drivers and stated that the new contract "would take care of them." Testimony further indicated, however, that in various meetings of the Union members, Adams' men, who were a minority of some 12 or 15 among 1,000, did not openly oppose the 4-cent rate, and did not vote against it upon submission for ratification.

Upon this evidence, the case was submitted to the jury on instructions which included the conspiracy charge, and as to which counsel for appellant, with candor, has this to say in its brief: "The trial court properly submitted the issue of an unlawful conspiracy for the jury's determination; and we have no fault to find with the instructions of the court in that regard." As observed at the outset, the jury found in favor of the appellees.

Urging that its second amended complaint tendered the issue that the 1950 contract was, in and of itself, illegal, in restraint of trade and violative of Section 1 of the Sherman Act,[4] the appellant contends that prejudicial error flowed from the court's refusal to recognize and submit this issue to the jury.

Upon the record presented, and under controlling legal principles, we are convinced that this allegation of error cannot be sustained.

As we view the complaint in its entirety, consisting of twenty-four paragraphs, and in light of the circumstances attending the trial, a serious question is presented as to whether the so-called contract theory was encompassed in the complaint or was an issue actually litigated. The allegations charged appellees with formation of, and entry upon, a conspiracy to control and affect appellant's costs of distribution of fluid milk for the purpose of compelling appellant to abandon the sale of fluid milk in the St. Louis area at prices lower than the prices of such product as sold and distributed by appellee dairies, so that there was an undue and unreasonable restraint of trade or commerce in the sale and distribution of fluid milk in said area. Following the conspiracy charge and in paragraph twenty-three of the complaint this allegation appears:

"The defendants, and each of them, entered into, and are now, parties to said labor contract and at

4. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 26 Stat. 209, 15 U.S.C.A. § 1.

all times herein mentioned have continuously maintained the said contract, the same being a contract in restraint of trade and commerce as herein alleged; that the said contract is unlawful and illegal, and violates Section One of the said Sherman Act in that it is a contract in restraint of trade or commerce among the several States within the meaning of said Section."

In his opening statement, counsel for appellant informed the jury: "The charge in this case is a charge, broadly speaking, *of conspiracy* to adversely affect competition in the milk industry in the St. Louis area." (Emphasis added.) From the foregoing, and the evidence, it would appear that the contention of St. Louis Dairy that the contract theory is without pleaded or factual foundation, rests on substance; however, we refrain from disposing of the assignment on this technical ground and shall accord it full consideration on the merits.

Appellant relies upon decisions, which, it insists, announce the principle that any agreement which imposes an unreasonable restraint upon commerce is, *in and of itself*, an unlawful restraint within the meaning of the Sherman Act [5] The so-called *"per se illegality"* doctrine was recognized and sanctioned in United States v. Trenton Potteries Co., 1927, 273 U.S. 392, 397, 47 S.Ct. 377, 71 L.Ed. 700.[6] There, the Court, in dealing with the effect and validity of price-fixing agreements under the Sherman Act, said at page 397, of 273 U.S., at page 379 of 47 S.Ct.:

"The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition. The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. * * * Agreements which create such potential power may well be held to be in themselves unreasonable or unlawful restraints, without the necessity of minute inquiry whether a particular price is reasonable or unreasonable as fixed and without placing on the government in enforcing the Sherman Law the burden of ascertaining from day to day whether it has become unreasonable through the mere variation of economic conditions."

In United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, Mr. Justice Douglas exhaustively considered the *"per se illegality"* doctrine and stated, at page 218 of 310 U.S. at page 842 of 60 S.Ct.:

"Thus for over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful *per se* under the Sherman Act and that no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense. And we reaffirmed that well-established rule in clear and unequivocal terms in Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 458, [60 S.Ct. 618, 84 L.Ed. 852], where we said:

" 'Agreements for price maintenance of articles moving in interstate commerce are, without more,

5. Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 608, 73 S.Ct. 872, 97 L.Ed. 1277; International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218; 60 S.Ct. 811, 84 L.Ed. 1129; United States v. United States Gypsum Co., 333 U.S. 364, 388–389, 68 S.Ct. 525, 92 L.Ed. 746; United States v. Milk Drivers &

Dairy Employees Union, D.C.D.Minn., 153 F.Supp. 803, also cited by appellant for this contention, does not concern "per se illegality," inasmuch as a labor organization was involved and the facts turned on a question of *conspiracy*.

6. See Montague, " 'Per Se Illegality' and the Rule of Reason," Vol. 12 American Bar Assn. Antitrust Section Report (1958) pp. 69–104.

unreasonable restraints within the meaning of the Sherman Act because they eliminate competition. United States v. Trenton Potteries Co., 273 U.S. 392, [47 S.Ct. 377, 71 L.Ed. 700], and agreements which create potential power for such price maintenance exhibited by its actual exertion for that purpose are in themselves unlawful restraints within the meaning of the Sherman Act. * * *' "

■ Careful and studious consideration of appellant's cited *"Per Se* Illegality" cases, none of which bears factual resemblance to the instant situation, has convinced us that the principle has no application here.[7] Like many agreements between labor unions and employers, the subject 1950 labor contract may have affected the price at which appellant could sell and deliver fluid milk in the St. Louis area, but that result in and of itself, does not, as we understand the doctrine, stamp the contract as illegal *per se.*

■ Apart from circumstances (not here present) in which the Per Se Illegality doctrine was applied, the principle is firmly entrenched that in determining whether a restraint is unreasonable and therefore illegal and violative of the Sherman Act, resort must be had to the Rule of Reason. This rule, promulgated in 1911 in Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, and United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663, "draws the line between zones of legal and illegal conduct under the antitrust laws by consideration of all the factors and circumstances in any given situation. It permits consideration and analysis of any transaction * * * in the light of all the record evidence admitted for its materiality, relevancy, and probative value in relation to the antitrust issues in the case." Oppenheim, "Federal Antitrust Legislation," 50 Mich.L.R. 1139, at page 1151, and cases under marginal note 21 thereof. See also Montague, " 'Per Se* Illegality' and the Rule of Reason," Vol. 12, American Bar Association Antitrust Section Report (1958), pp. 69–104; Adams, "The 'Rule of Reason,' " 63 Yale L.J. pp. 348–370.

This rule has been adhered to through the intervening years. See United States v. E. I. Du Pont de Nemours & Co., 351 U.S. 377, at pages 386, 387, 76 S.Ct. 994, at page 1002, 100 L.Ed. 1264, where the Court stated:

"Judicial construction of antitrust legislation has generally been left unchanged by Congress. This is true of the Rule of Reason. While it is fair to say that the Rule is imprecise, its application in Sherman Act litigation, as directed against enhancement of price or throttling of competition, has given a workable content to antitrust legislation. * * *It was judicially declared a proper interpretation of the Sherman Act in 1911, with a strong, clearcut dissent challenging its soundness on the ground that the specific words of the Act covered every contract that tended to restrain or monopolize. This Court has not receded from its position on the Rule. There is not, we think, any inconsistency between it and the development of the judicial theory that agreements as to maintenance of prices or division of territory are in themselves a violation of the Sherman Act. It is logical that some agreements and practices are invalid *per se,* while others are illegal only as applied to particular situations."

Since there was no basis for submission of the "Illegality Per Se" theory, the crucial issue of whether the conduct and course of action pursued by appellees resulted in an unreasonable restraint of trade within the prohibition of the Act, necessarily had to be resolved

---

7. See also, Oppenheim, "Federal Antitrust Legislation," 50 Mich.L.R. 1139, and Adams, "The 'Rule of Reason,' " 63 Yale L.J. 348.

by consideration of all the factors and circumstances as developed by the material and relevant evidence. As we have seen, this issue was determined adversely to appellant's claim, upon instructions which furnished the jury with a proper guide.

It should also be emphasized that this controversy bears another feature vitally distinguishing it from the cases where the "Illegality Per Se" doctrine was applied, in that a labor union was a participant in the activities which culminated in the 1950 labor contract. Under decisional law, a labor organization is immune to Sherman Act liability unless it is found to have conspired with non-labor groups for purposes not connected with legitimate labor ends. Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939. See also United States v. Hutcheson, 312 U.S. 219, 232, 61 S.Ct. 463, 85 L.Ed. 788; Annotation, 29 A.L.R.2d 323, 408. As urged by the Union, when labor organizations are involved, it is necessary to look apart from the Sherman Act, and consider it in conjunction with the Clayton Act, 38 Stat. 730,[8] and the Norris-LaGuardia Act, 47 Stat. 70.[9] For an exhaustive discussion of the history of the antitrust laws, as applied to labor unions, see Allen Bradley Co. v. Local Union No. 3, supra; Annotation, 29 A.L.R.2d 323. Briefly stated, after passage of the Sherman Act, Federal Courts held that its provisions were applicable to union activities, and employers were given injunctions against those union practices which unreasonably restrained the flow of commerce. Labor obtained relief from these decisions by Section 6 of the Clayton Act, which provides that labor is not a commodity or article of commerce, " * * * nor shall such organizations, * * * be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws." [10] Section 20 of the Clayton Act [11] further directs that no injunctions shall be issued against unions arising from disputes over terms or conditions of employment. Following cases which ruled that unions were protected from antitrust liability only when the acts complained of involved activities between the union and the immediate employer,[12] the Norris-LaGuardia Act, 47 Stat. 70,[13] gave further relief to labor, by establishing that the area of permissible union activity, free of antitrust liability, was not to be restricted to immediate employer-employee disputes. From this background of judicial pronouncements and legislation, it is clear that the question of a union's liability under the antitrust laws " * * * is to be determined only by reading the Sherman Law and § 20 of the Clayton Act and the Norris-LaGuardia Act as a harmonizing text of outlawry of labor conduct." United States v. Hutcheson, 312 U.S. 219, at page 231, 61 S.Ct. 463, at page 466.

Unions, however, do not enjoy a blanket immunity to liability under the antitrust laws. As stated, if the evidence discloses that a labor organization has acted in conjunction with other business groups for the purpose of securing ends prohibited by the Sherman Act, and was not primarily motivated by labor goals, the union may be liable to private parties, or injunctions may be issued.[14] The union's liability ultimate-

8. 15 U.S.C.A. §§ 12–27; 29 U.S.C.A. § 52.

9. 29 U.S.C.A. §§ 101–115.

10. 15 U.S.C.A. § 17.

11. 29 U.S.C.A. § 52.

12. See Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349; Bedford Cut Stone Co. v. Journeymen Stone Cutters Ass'n, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916.

13. 29 U.S.C.A. § 113.

14. See Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L. Ed. 1939; United States v. Women's Sportswear Mfg. Ass'n, 336 U.S. 460, 464, 69 S.Ct. 714, 93 L.Ed. 805; McHugh v. United States, 1 Cir., 230 F.2d 252, 254–255, certiorari denied, 351 U.S. 966, 76 S.Ct. 1030, 100 L.Ed. 1486; Philadelphia Record Co. v. Manufacturing Photo-

ly depends on the facts—" * * * the same labor union activities may or may not be in violation of the Sherman Act, dependent upon whether the union acts alone or in combination with business groups." Allen Bradley Co. v. Local Union No. 3, supra, 325 U.S. at page 810, 65 S.Ct. at page 1540. Ordinarily, such a factual determination is for a jury. Truck Drivers' Local No. 421, International Brotherhood of Teamsters, etc. v. United States, 8 Cir., 128 F.2d 227, 233. Here, the question of conspiracy was properly submitted to a jury, and, implicit in the jury's finding of no conspiracy among the appellees, is a determination that the union did not conspire with non-labor groups—that, as a fact, the union acted alone in seeking legitimate labor objectives. To our mind, this is determinative of any question appellant raises as to its right to an instruction on per se illegality.

Conjoined in the assignment dealing with the failure of the trial court to submit what has been designated as the "Illegality Per Se" theory, is the contention that prejudicial error resulted from the Court's charge to the jury, by inclusion therein of instructions designated for the purposes of this appeal, as P–3, U–3 and P–9. P–3 authorized a verdict for Pevely upon finding that Pevely accepted the labor contract without any understanding or agreement, tacit or expressed, with anyone at any time, to interfere with or restrain the trade or business of Adams. No claim is made that the instruction did not properly declare the law—rather appellant argues that the instruction "plainly excludes the contract theory from the jury's consideration and permits a plaintiff's verdict only on the conspiracy theory." From what we have heretofore said, Instruction P–3 was proper.

Instructions U–3 and P–9, dealing with the Union, manifestly declared the law as announced by the Supreme Court

in the Allen Bradley case, supra, as applicable to the activities of the Union in negotiating the 1950 labor contract. Appellant's objections thereto are completely without merit.

This brings us to the final assignment which has for its foundation alleged misconduct on the part of the trial judge. In particular, the charge is made that the judge indulged in unwarranted and improper remarks and comments throughout the entire proceeding, and that the cumulative effect of such conduct prevented appellant from having a fair and impartial trial.

The rules designed to afford a guide to trial judges and counsel in controlling their conduct during trial have been so clearly enunciated and defined through the years, that all members of the bench and bar alike should be familiar with them and no useful purpose would be served in reannouncing them here. Those interested may review Montgomery Ward & Co. v. National Labor Relations Bd., 8 Cir., 103 F.2d 147; Inland Steel Co. v. National Labor Relations Bd., 7 Cir., 109 F.2d 9; Blumberg v. United States, 5 Cir., 222 F.2d 496, 501; Garber v. United States, 6 Cir., 145 F.2d 966; Glasser v. United States, 315 U.S. 60, at pages 82 and 83, 62 S.Ct. 457, at page 470, 86 L.Ed. 680; United States v. Bergamo, 3 Cir., 154 F.2d 31, at page 35; Norwood v. Great American Indemnity Co., 3 Cir., 146 F.2d 797, at pages 800, 801.

The zeal with which counsel for appellant present this contention on appeal contrasts sharply with their failure to demonstrate any concern at the time the challenged conduct was in progress. A painstaking and assiduous examination of the voluminous record reveals that not a single objection was made or exception taken to the conduct of the judge, said to be so prejudicial as to constitute denial of due process. Under Rule 46 of the

Engravers Ass'n, 3 Cir., 155 F.2d 799, 803; Truck Drivers' Local No. 421, International Brotherhood of Teamsters, etc. v. United States, 8 Cir., 128 F.2d

227, 232; United States v. Milk Drivers and Dairy Employees Union, D.C.Minn., 153 F.Supp. 803. See also Annotation, 29 A.L.R.2d 323.

Federal Rules of Civil Procedure, 28 U.S. C.A., a party is required to make known his objection and grounds therefor. Substance inheres in this requirement, and observance thereof is essential to the administration of the business of the courts. The purpose of the rule is to promptly inform the trial judge of possible errors so that he may have an opportunity to reconsider his ruling and make any changes deemed desirable. Fort Worth & Denver Ry. Co. v. Harris, 5 Cir., 230 F.2d 680, 682. In Louisiana & Arkansas Ry. Co. v. Johnson, 214 F.2d 290, 292, certiorari denied 348 U.S. 875, 75 S.Ct. 111, 99 L.Ed. 688, and Dowell, Inc., v. Jowers, 182 F.2d 576, 579, both 5th Circuit cases, it was ruled that it is the duty of counsel to make objection at the time improper remarks or comments are made by the judge. In Manhattan Oil Co. v. Mosby, 8 Cir., 72 F.2d 840, at page 845, this Court, speaking through Judge Sanborn, stated: "The defendants complain that certain statements made by the trial judge in sustaining objections to the introduction of evidence were prejudicial to them. It is sufficient answer that no exception was taken to the remarks. Hence the question is not before us." (Citing cases.)

While we do not countenance the practice of counsel raising for the first time, after trial, allegations of procedural error, as was done in this case, nevertheless, under our duty to determine whether the parties were denied substantial justice, we have given full consideration to the contention. See Rule 61, Federal Rules of Civil Procedure and 28 U.S.C.A. § 2111. The purpose and scope of our review comes down to determining whether or not, despite technical errors in trial procedure, the party complaining was deprived of substantial justice. "The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Rule 61, Federal Rules of Civil Procedure.

In the instant situation counsel for appellant have directed our attention to some fifty-four separate remarks of the trial judge interspersed throughout the ten days of trial. Viewed in a collective sense, at first sight, and out of context, it might be said that some of the comments seemed unduly harsh. However, after meticulous study of the entire record of over 600 printed pages, we are convinced that they do not demonstrate an attitude of unfairness and partiality on the part of the judge, and they were not prejudicial.

In Goldstein v. United States, 8 Cir., 63 F.2d 609, this court was called upon to determine whether remarks of the judge during the trial of the case displayed an attitude of prejudice. It will be observed that the remarks complained of in that case, although intemperate, were insufficient to establish that they were prejudicial to the defendant. So in this case, although it would have been better if some of the comments of the judge had been left unsaid, we are convinced that, when considered in light of the whole record, the judge's actions did not demonstrate an attitude of unfairness, partiality or prejudice. As was said in the Goldstein case, at page 613: "An appellate court should be slow to reverse a case for the alleged misconduct of the trial court, unless it appears that the conduct complained of was intended or calculated to disparage the defendant in the eyes of the jury and to prevent the jury from exercising an impartial judgment upon the merits."

The judgment is affirmed.