**JEWEL TEA COMPANY, Inc., Plaintiff,**

v.

**LOCAL UNIONS NOS. 189, 262, 320, 546, 547, 571, 638, AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA, AFL–CIO et al., Defendants.**

No. 58 C 1415.

United States District Court
N. D. Illinois, E. D.
March 22, 1963.

George B. Christensen, Fred H. Daugherty, Richard W. Austin, Winston, Strawn, Smith & Patterson, Chicago, Ill., for plaintiff.

Asher, Gubbins & Segall, Chicago, Ill., for defendant Locals 189, 262, 320, 546, 547, 571 and 638, Amalgamated Meat Cutters & Butcher Workmen.

Libit, Lindauer & Henry, Chicago, Ill., for Associated and Chas. H. Bromann.

Eardley & Ward, Chicago, Ill., for Local Unions Nos. 189, 262, 320, 546, 547 and 638 of Amalgamated Meat Cutters, etc.

LA BUY, District Judge.

Plaintiff Jewel Tea Company seeks a declaratory judgment, injunctive relief and treble damages under the anti-trust laws, charging that the defendant unions and the Associated Food Retailers of Greater Chicago, Inc., an association of independent retail stores, conspired to suppress competition among retail meat markets in the Chicago area by limiting the marketing hours for the sale of fresh meat. The sufficiency of the complaint was sustained by this court and affirmed by the Court of Appeals on an interlocutory appeal. (Jewel Tea Co. v. Local Unions, et al., 274 F.2d 217, (7th Cir., 1960.) The cause was remanded and tried by this court without a jury.

At the close of plaintiff's case this court allowed the motion to dismiss of defendants Bromann and Associated on the ground that there was no evidence showing that either or both of these defendants conspired with the defendant union in forcing the restrictive provision upon plaintiff. Since plaintiff sought relief from the defendant unions apart from the theory of conspiracy, the unions' motion to dismiss was denied. The court must now determine, on the basis of the entire record, whether the provision limiting marketing hours for the sale of fresh meat in the collective bargaining agreement between the defendant unions, plaintiff and other employers violated the anti-trust laws, and entitled plaintiff to the relief demanded.

This issue was not and could not have been previously determined by this court or by the Court of Appeals in the proceedings evaluating the pleadings. It was not possible at the pleading stage to determine whether the challenged provision was the means of effectuating a conspiracy, or was a part of the conditions of employment. In affirming the sufficiency of the complaint, the Court of Appeals predicated its decision in part on the proper assumption of the existence of the alleged conspiracy between the unions and non-labor groups, and in part on the necessity of a trial to ascertain whether the restraint was unreasonable. (274 F.2d 221, 222, 223.)

The adjudication of the issue now before the court necessitates a review of the purport, history and effect of the marketing hour restriction in the collective bargaining agreement. The uncontroverted evidence shows that the limitation upon market operating hours originated after the butchers strike of 1919 in opposition to the prevailing 81 hour, 7 day work week. The ensuing 1920 collective bargaining agreement governing Meat Cutters imposed limitations on hours of labor and upon marketing hours. It provided:

"Article 1—Nine hours shall constitute the basic working day, hours shall be 8 A.M. to 6 P.M., excepting Saturdays and days preceding holidays beginning at 8 A.M. and quitting at 9 P.M., allowing 1 hour for dinner and one-half hour for supper. Employees must be dressed and ready for work at 8 A.M.

"Article 2—It is expressly understood *that no customers will be served who come into the market after 6 P.M. and 9 P.M. on Saturdays and on days preceding holidays,* that all customers in the shop at the closing hour be served, that all meats be properly taken care of and markets placed in a sanitary condition, such work not to be construed as overtime. Overtime to be limited to 1 hour every day and *shall be performed behind locked doors.*

"Article 3—There shall be no work on Sundays, Decoration Day, Fourth of July, Labor Day, Thanksgiving

Day, Christmas Day or New Years Day." (Emphasis added.)

The hours established by the 1919 strike continued until 1937, when the Saturday work hours and marketing hours were reduced and set at 8:30 A.M. to 7 P.M. Further modifications of working hours and correlative marketing hours were made in 1941, 1945, 1946 and in 1947, when they were set at 9 A.M. to 6 P.M. Monday through Saturday, with marketing hours no later than 6 P.M. The hours thus established have continued to the present. These changes, taken from agreements of Local 546, were followed in the agreements of all the defendant unions, except Local 189, which executes a separate agreement to meet conditions peculiar to it.

From the inception of plaintiff's operation of meat markets in the Chicago area in 1933, it entered agreements with the defendant unions containing these marketing hour restrictions, which were identical to agreements made with other meat market employers in the Chicago area.

The current collective bargaining agreement includes a "Service Contract" applicable to service meat markets, and a "Self-Service Contract" applicable to self-service meat markets. This differentiation began in December 1952, on the advent of the self-service mode of vending meat in this area. These contracts recognize the union as the exclusive bargaining representative of all employees in the meat department who process, wrap, handle and sell frozen and fresh meats on the employer's premises. With minor exceptions, the contracts require that the work entailed in the preparation and sale of meat, including the replenishment of stock and cleaning of counters shall be performed exclusively by the meat department employees represented by defendant unions. Both contracts provide that 8 hours shall constitute the basic work day, which shall begin no earlier than 8 A.M. and end no later than 6 P.M. They provide also that "at the employer's discretion over-

time at overtime rates may be worked after 8 hours in any one day and behind locked doors after 6 P.M." They further specify that "market operating hours shall be 9 A.M. to 6 P.M. Monday through Saturday," and that no customer shall be served who comes into the market before or after these hours. The contracts do authorize the sale after 6 P.M. of certain products other than fresh meat.

The collective bargaining agreement also provides that the unions agree not to enter into a contract with any other employer designating lower wages, or longer hours, or any more favorable conditions of employment.

Similar contract provisions, or with variants for a single night operation, are in operation in other metropolitan areas.

The record sets forth in detail the method of bargaining between the employer group and the union group, followed since 1941, and the negotiations relative to the 1957, 1959 and 1961 contracts. Each group formulates its position independently. The union's demands are based on a preliminary survey of members, who are consulted in the course of negotiation, and must ratify any agreement; and the employers meet in advance of negotiations to explore their objectives, and caucus periodically to determine their bargaining position.

On July 25, 1957, the defendant unions gave notice of their desire to negotiate the new contract. They presented their demands to the employer group on August 20. On August 9 plaintiff's principal negotiator, E. T. Vorbeck, and representatives of various chain stores formulated 6 employer demands for negotiations: night openings, female wrappers, automatic wrapping machines, flexible work day, right to pre-price off premises, and the right to sell fresh frozen meats. On August 30, Vorbeck apprised Carl H. Bromann, Secretary of Associated, who had acted as chairman for the entire employer group in 1950, of the demands of the chain stores and

of the scheduled meeting with the unions on September 5. On that date the union representatives met and exchanged demands with the representatives of the employer group, including plaintiff, National Tea, Associated, Hillmans, High-Low, Krogers, A & P, Piggly Wiggly, Goldblatts, Wieboldts, Save-Way, Del Farm, Sure-Save and I.G.A. Substantially the same group of employers continued to meet with the unions through the 1957 negotiations.

It would serve no useful purpose and would unduly prolong this opinion to detail the proposals and counter-proposals made at the numerous meetings that followed. Suffice to note they indicated that the unions from the outset did not want night work; and that the employers' demand for night operating hours were intertwined with the extension of working hours and the "flexible day," which meant starting later and working nights, as well as with various wage premiums "to sell" night work.

Typical of the negotiations is the all-employer proposal of November 15, 1957, which stipulated for Friday, night operations, with a male employee on duty during marketing hours, and extended the work day on Friday between 8 A.M. and 9 P.M. Not only did Associated join in this proposal, but at a subcommittee meeting prior to its introduction Bromann personally requested R. Emmett Kelly, the union representative, to agree to night marketing operations.

The record also shows that plaintiff, who threatened to sue as a co-conspirator any employer who opposed night marketing operations, offered at the close of the 1957 negotiations to give up that demand if the unions would agree to female wrappers. No such alternative concession was made by National Tea Co. The union, however, refused to accept either night operations or female wrappers, and ratified a contract without those provisions, notwithstanding plaintiff's threatened litigation. Moreover, Local 546, by secret ballot, authorized a strike if necessary to avoid night operations, by a vote of 2,253 in favor to 98 against. The employers signed the collective bargaining agreement with the restriction, and plaintiff alone immediately instituted these proceedings.

During the 1959 negotiations the union group was willing to bargain on night marketing hours. However, in the absence of agreement on a sufficient wage incentive, the final contract retained the restriction, but eliminated payment of time-and-a-half for work between 8 A.M. and 9 A.M., and granted the employer group a limited flexible day.

In the 1961 negotiations the employer demands for night marketing operations were again intertwined with night working hours and wage incentives for night work. The all-employer proposal of September 12, drafted by plaintiff, committed market operating hours to the unlimited discretion of the employer, and provided for employees to be "scheduled" to work after 6 P.M. It also established a "supper period" to end no later than 8 P.M., and stipulated that "hours and days to be worked by each employee shall be determined by the employer," and that all employees may be required to work overtime.

Similarly, plaintiff's proposal number 2 of November 13 also contemplated night operations and stipulated that a journeyman be on duty during all hours that fresh meat is offered for sale between 9 A.M. and 9 P.M. Monday, Thursday and Friday, and as needed after 6 P.M. on Tuesday, Wednesday, Saturday and Sunday. Only one proposal was ever made by plaintiff in the course of the prolonged negotiations on all three contracts, which suggested night operations without butchers on duty, and that was submitted to the unions at the end of the day as negotiations were "breaking up" on November 16, 1961.

Defendant unions questioned the seriousness of that proposal under the circumstances. They also presented evidence that a self-service meat market cannot operate at night without employees on duty to rearrange and replenish stock in the counters, and give

customers necessary personal attention. They showed that in most of plaintiff's stores outside Chicago, where night operations exist, meat cutters are on duty whenever a meat department is open after 6 P.M., and that plaintiff has extended market operations in a substantial number of stores to 11 P.M. for 6 nights a week and on Sundays. Even in self-service departments, ostensibly operated without employees on duty after 6 P.M., there was evidence that requisite customer services in connection with meat sales were performed by grocery clerks. In the same vein, defendants adduced evidence that in the sale of delicatessen items, which could be made after 6 P.M. from self-service cases under the contract, "practically" always during the time the market was open the manager, or other employees, would be rearranging and restocking the cases. There was also evidence that even if it were practical to operate a self-service meat market after 6 P.M. without employees, the night operations would add to the workload in getting the meats prepared for night sales and in putting the counters in order the next day.

The record also showed that plaintiff differed with all the other employers by insisting that the health and welfare plan should not be cost free to the employees, and would not assent to the industry settlement until January 2, 1962.

Plaintiff adduced testimony of numerous witnesses that they were inconvenienced by the restriction on night sales of fresh meat, and would buy more meat if night hours were available. Some 11 butchers testified that they would be willing to work at night. There is also evidence that plaintiff's meat cutters voted 759 to 28 against night work in a mail ballot.

Defendants submitted a Department of Agriculture survey of food consumption showing that the amount of meat purchased is dictated by income. They also presented a study compiled by the Bureau of Labor Statistics respecting average consumer expenditure for meat, which indicated that Chicago, where night sales of meat were restricted, ranked 4th of 49 large cities in total meat expenditures; and of 11 cities with a population of over one million, Chicago ranked 3rd for all meat sales, and highest for pork sales. Of the 11 cities, Cleveland, where night sales were also restricted, stood 2nd highest in expenditures for all meat, and 2nd highest for beef sales. Defendant submitted these statistics to show that night marketing hours have no effect on the amount of meat purchased.

To establish damages resulting from the limitation on marketing hours, plaintiff introduced a study made by one of its employee accountants of differences in 9 store earnings the year before and the year after night meat operations were authorized. The study purported to show that the increase in earnings was due to the evening marketing hours for meat. Defendants attacked the validity of the study on numerous grounds. The study, made by an employee who had only a single half-semester course in statistics, failed to take account of certain economic variables affecting sales and profits; the study erroneously included one store in which no change in hours occurred; a decrease in sales and earnings occurred in two stores; and the increase in earnings in another store was identical with the average increase in earnings for the same period in stores in which there were no night operations.

It is within this factual framework that the restriction in the collective bargaining agreement must be viewed in determining whether it violates the antitrust laws.

■ Section 1 of the Sherman Act makes illegal any contract, combination or conspiracy in restraint of trade among the several states. (15 U.S.C.A. § 1.) Where labor union activities are involved, this section must be considered jointly with section 20 of the Clayton Act and the Norris-LaGuardia Act. (15 U.S.C.A. §§ 12–17; 29 U.S.C.A. §§ 52, 101–115; United States v. Hutcheson,

312 U.S. 219, 231, 61 S.Ct. 463, 85 L. Ed. 788.) These "interlacing statutes" declare two congressional policies: "to preserve a competitive economy," and "to preserve the rights of labor to organize to better its conditions through the agency of collective bargaining." (Allen Bradley Co. v. Local Union, 325 U.S. 797, 806, 807, 65 S.Ct. 1533, 89 L.Ed. 1939.) In reconciling these policies the Supreme Court has held that there was no congressional intent to bestow a blanket immunity upon labor unions if they combined with non-labor groups to create business monopolies and fix prices. (Allen Bradley Co. v. Local Union, supra, at p. 807, 65 S.Ct. at p. 1533; United Brotherhood of Carpenters v. United States, 330 U.S. 395, 398, 67 S.Ct. 775, 91 L.Ed. 973; United States v. Women's Sportswear Assoc., 336 U.S. 460, 463, 69 S.Ct. 714, 93 L.Ed. 805.) As the U. S. Supreme Court adroitly stated in the Women's Sportswear case, "benefits to organized labor cannot be utilized as a 'cat's paw' to pull employer's chestnuts out of the anti-trust fires."

Although plaintiff initially contended, and still asserts that the defendants conspired with Associated, a non-labor group, to suppress competition by the market operating restriction on the sale of fresh meat before 9 A.M. or after 6 P.M. Monday through Saturday, and that the unions acted as the enforcing agents of the conspiracy, this theory failed to withstand the "crucible of trial." As previously noted, at the close of plaintiff's case, this court allowed a motion to dismiss Associated and Bromann from the cause since the record was devoid of any evidence to support a finding of conspiracy.

■ The record showed only that Bromann, on behalf of Associated, which represented some 1000 individual and independent food stores, dealt with the unions at arm's length. At no time did he receive a direction to demand a 6 P.M. closing; nor did he make any such demand. On the contrary, Associated, through Bromann, joined in the all-employer offer of November 15, 1957, demanding the elimination of the restriction on night marketing, and specifically requested that change from the union representative at a subcommittee meeting. Even Vorbeck's letter of October 1, 1961, to his company, stated that Associated did not oppose night work, but that some opposition came from other chains. This fluctuating opposition by some employers to night operations because of their high cost is hardly tantamount to a conspiracy with the unions. Hence, any attempt to reassert that theory must fail.

■ In determining whether the contract itself, apart from any theory of conspiracy, violated the Sherman Act, there is some merit to defendants' procedural objection that the case, after the dismissal of Bromann and Associated, should not have proceeded forward on a different basis from that alleged in the complaint, as sustained by the Court of Appeals. However, it is preferable to dispose of the case on the merits, rather than on technical or procedural grounds. (Adams Dairy Co. v. St. Louis Dairy Co., 8 Cir., 260 F.2d 46, 52 (1958).)

■■ The mere fact that a collective bargaining agreement is entered between the employers of an industry and the union does not automatically offend the Sherman Act. (Allen Bradley Co. v. Local Union, supra, at p. 809, 65 S.Ct. at p. 1539.) There is no "litmus paper" test to determine whether a particular bargaining provision is within the labor exemption, or is in derogation of the anti-trust laws. Courts have emphasized such factors as whether the provision originated with labor or with the non-labor group (United States v. Women's Sportswear Assoc., 336 U.S. 460, 69 S.Ct. 714, 93 L.Ed. 805); whether its purport was essentially to benefit the union in its legitimate objectives (Philadelphia Record Co. v. Mfg. Eng'r Assoc., 3 Cir., 155 F.2d 799; Schatte v. Int. Alliance, 9 Cir., 182 F.2d 158); whether it was imposed by the union after arm's length negotiation (United States v. Milk Driv-

er's Union, D.C., 153 F.Supp. 803, 806; Adams Dairy Co. v. St. Louis Dairy Co., supra, 260 F.2d at p. 54); and whether it effectuated results prohibited by the Sherman Act, such as price fixing or the elimination of competition (United States v. Employing Plasterer's Assoc., 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618; United States v. Gasoline Retailer's Assoc., 7 Cir., 285 F.2d 688; United Brotherhood of Carpenters v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973.)

The record before this court shows that the restriction on marketing hours originated as a result of the union's strike against the 81 hour, 7 day work week in 1919, long before plaintiff sold meat or Associated was organized. It was inserted in the collective bargaining agreement in juxtaposition to, and as an implementation of, the Article specifying hours of work for butchers. In fact, through the years each change in hours of labor brought a corresponding change in market operating hours, until night work was finally eliminated in the Chicago area in 1947. Lifting the restriction on marketing hours would mean a return to longer hours and night work. This is evident from the face of the employer proposals, which included the "flexible day," night hours, and wage premiums "to sell" night work, and from the practices of the trade, particularly in plaintiff's stores where night sales of fresh meat were authorized.

Moreover, even the single offer made by plaintiff at the close of negotiations in 1961 for night operating hours without night work for butchers in the self-service markets was contrary to the union's self interest. It meant that their work would be done by others unskilled in the trade, since the evidence showed that in stores where meat is sold at night it is impractical to operate without either butchers or other employees. Someone must arrange, replenish and clean the counters and supply customer services. In addition, that proposal would involve an increase in workload in preparing for the night work and cleaning the next morning.

■ Thus, the unions' insistence on the retention of the marketing hours restriction was based upon its desire to protect its right not to work at night, and to protect its work from being taken by others. Those facts and circumstances are inimicable to plaintiff's theory that the unions insisted on the restriction as the tool of the employer group and at their behest. On the contrary, the evidence established that the restriction was imposed after arm's length bargaining, including an overwhelming strike vote against night work, and was fashioned exclusively by the unions to serve their own interests—how long and what hours members shall work, what work they shall do, and what pay they shall receive. These are not objects which the anti-trust laws proscribe. They are conditions of employment, and as such are clearly within the labor exemption of the Sherman Act. (Adams Dairy Co. v. St. Louis Dairy Co., 260 F.2d 46; Order of Railroad Telegraphers v. Chi. & N. W. R. Co., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774; Hunt v. Crumboch, 325 U.S. 821, 65 S.Ct. 1545, 89 L. Ed. 1954; United States v. American Fed. Musician's, D.C., 47 F.Supp. 304, aff'd 311 U.S. 741, 63 S.Ct. 665, 87 L.Ed. 1120; United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788.

Under this analysis the case of Allen Bradley Co. v. Local Union, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939, relied upon by plaintiff, cannot be deemed determinative, since the collective bargaining agreement there looked, not to the terms and conditions of employment, but to price and market control. Certain contractors, manufacturers and unions combined through the medium of collective bargaining agreements to prevent out-of-state electrical equipment from being used locally. Under closed shop agreements the contractors were obliged to purchase equipment solely from local manufacturers, who had closed shop agreements with the union, and the manufacturers were obliged to confine their New York City sales to contractors employing union members. The plan re-

sulted in a protected city market, whereby identical goods were sold at higher prices within the city than outside of it. The court held that although the union benefitted by higher wages from the plan, this was no mere labor dispute, but rather a combination to monopolize trade, control its price, and discriminate between customers in violation of the Sherman Act.

Nor does this court find persuasive other cases where the objective and effect of the collective bargaining agreement was to fix prices and control markets. (United Brotherhood of Carpenters v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973; United States v. Women's Sportswear Assoc., 336 U.S. 460, 69 S.Ct. 714, 93 L.Ed. 805; United States v. Milk Drivers' Union, 153 F. Supp. 803; Philadelphia Record Co. v. Mfg. Eng'r Assoc., 155 F.2d 799.)

Analogy may be made more appropriately to the Adams Dairy case. (Adams Dairy Co. v. St. Louis Dairy Co., 260 F.2d 46.) Complaint was made there by one dairy that an industry-wide labor contract between the union and other dairies contained a provision raising commissions for longer runs under a point system, which, plaintiff claimed, adversely affected its costs and compelled it to lose its competitive position in violation of the Sherman Act. As in the instant case, the smaller dairies who were made defendants insisted that the contract was negotiated at arm's length; and the unions asserted that they were proceeding in self interest in raising rates for longer runs, since this would ease the heavy loads which were damaging to the health of the drivers, and would encourage route splitting, thereby creating more jobs.

The jury found that there was no conspiracy between the union and non-labor groups, and, on review, the court was required to determine, as in the case at bar, whether the contract in and of itself was illegal. In so doing the court examined the purpose of the provision and the circumstances surrounding negotiations. It found that the rate change was resisted by the dairies, and that there was no discussion of plaintiff's particular position in the market. In concluding that the provisions did not violate the Sherman Act, the court predicated its decision on several distinct grounds. Although the contract provision conceivably affected milk prices, as did other conditions in the collective bargaining agreement, it was neither illegal per se as a price-fixing contract, nor an "unreasonable" restraint of trade under the facts and circumstances of the industry. Furthermore, since there was no conspiracy by the union, which was motivated by labor goals, the provision was within the labor exemption of the Act.

Since the Adams case involved the same operative facts as the case before this court, in that there was no conspiracy, but only a controverted provision in a collective bargaining agreement, which was fashioned by the union in its self interest and imposed upon employers despite their opposition, the case is a cogent precedent supporting the validity of the provision.

The court also finds apposite the statement and determination of the U. S. Supreme Court in Order of Railroad Telegraphers v. Chi. & N. W. R. Co., 362 U.S. 330, 362, 80 S.Ct. 761, 4 L.Ed.2d 774. There the Court held that the union's demand that the collective bargaining agreement specify that positions in existence as of a certain date would not be abolished except by agreement did not violate the Sherman Act. At p. 336, 80 S.Ct. at p. 778, the court stated:

"We cannot agree with the Court of Appeals that the union's effort to negotiate about the job security of its members represents an attempt to usurp legitimate managerial prerogative in the exercise of business judgment with respect to the most economical and efficient conduct of its operations."

Under this rationale, since the record here shows that night meat sales, even

in self-service markets, require as a matter of practical operation the services of either butchers or other employees, the unions' insistence on the restriction to protect their work and job security, should be deemed a proper labor goal, and in no way a usurpation of the managerial prerogative. Therefore, that decision further substantiates the conclusion that the marketing hours restriction here, in protecting butchers against night hours and loss of work is within the labor exemption of the Sherman Act.

■ Even if the restriction on marketing hours were not held to be within the labor exemption, the provision would not necessarily violate the Sherman Act. Its legality would then be adjudged as any other contract between non-labor groups. Since the provision does not direct action held illegal per se, such as price-fixing, division of markets, or the creation of a monopoly, (United States v. Socony Vacuum Oil Co., 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129; Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545; cf. United States v. Gas. Ret. Ass'n, 7 Cir., 285 F.2d 688), its legality depends upon whether it creates an "unreasonable" restraint of trade under the particular facts and circumstances relating to the industry. (United States v. E. I. DuPont de Nemours & Co., 351 U.S. 377, 386, 76 S.Ct. 994, 100 L.Ed. 1264; Appalachian Coals Inc. v. United States, 288 U.S. 344, 373, 53 S.Ct. 471, 77 L.Ed. 825).

■■ Admittedly, collective bargaining agreements involve some restraint on competition. The mere fact that an agreement restrains competition, however, is not enough to condemn it. (Allen Bradley v. Local Union, 325 U.S. at p. 801, 65 S.Ct. at p. 1536; Appalachian Coals Inc. v. United States, 288 U.S. at p. 360, 53 S.Ct. at p. 474). In the Appalachian Coal case the United States Supreme Court stated, "The legality of an agreement * * * cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains." The court then explained that the application of the statute depended upon intent and effect, to be determined by close scrutiny of the conditions of the industry, and the purpose and consequences of the restriction in relation to market prices.

The restriction on night sales of fresh meat obviously restrained a small segment of competition. There is no evidence, however, that it in any way destroyed competition among purveyors of fresh meat, created a monopoly, or adversely affected one purveyor more than another. (cf. Philadelphia Record Co. v. Mfg. Eng'r Co., 155 F.2d 799). Nor did the evidence in any way establish that less meat is consumed in this area, in proportion to population and income, because of the restriction, than in areas where fresh meat is sold at night. In fact, the objective statistics indicated that the restriction had no discernible effect. Furthermore, the doubtful benefits of night operations to the industry was evident from the fluctuating attitude of both the chains and independents during the course of the various contract negotiations.

With respect to the effect of the restriction on the public, even if the self-service meat departments could operate at night without employees, there is no showing that such operations would result in economies or lower prices. Assuming arguendo the economic validity of the statistical study made by plaintiff's accountant relating to increased profits after night meat sales were undertaken in the stores studied, that study in no way established that lower prices ensued. In contrast to the Allen Bradley case, where the price of electrical equipment was lower outside of New York than in the city because of the offending restriction, in the case at bar there is no evidence that in areas where night operations are in effect the price of meat is lower, or, if so, the difference is due to the night marketing hours.

The only conceivable deleterious effect on the public from the restriction here is that those persons who find it more convenient to shop for meat at night are deprived of that convenience. However, the fact that some consumers would prefer longer than 54 hours during the week within which to buy fresh meat can hardly constitute the basis for holding a restriction on night hours to be an unreasonable restraint of trade. In fact, such a determination would be inconsistent with the decision of the United States Supreme Court holding that a limitation on operating hours imposed by a trade organization was reasonable and did not offend the Sherman Act. (Chicago Board of Trade v. United States, 246 U.S. 238, 241, 38 S.Ct. 242, 62 L.Ed. 683).

Although the courts are, and should be, responsive to public convenience, they cannot invoke the Sherman Act as a "catch-all" remedy for any dissatisfactions with labor or business operations. There must be a curtailment of the values which the antitrust laws are designed to promote before the Act can be applied. (Apex Hosiery v. Leader, 310 U.S. 469, 489, 493, 60 S.Ct. 982, 84 L.Ed. 1311). According to this record, the purport, history and effect of the controverted provision indicates that it is within the labor exemption of the Sherman Act, unless that exemption be construed with "mutilating narrowness," (United States v. Hutcheson, 312 U.S. 219, 235, 61 S.Ct. 463, 85 L.Ed. 788), and that it imposed no "unreasonable" restraint on trade.

Since there is no violation of the Sherman Act the court need not consider whether plaintiff sustained any injury to its business, or whether it was in pari-delicto with the defendant unions.

The above and foregoing memorandum of the court shall constitute its findings of fact and conclusions of law. An order has this day been entered dismissing plaintiff's complaint.